**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**INDIANA BROADCASTING CORPORATION, Respondent.**

No. 14954.

United States Court of Appeals
Seventh Circuit.

Aug. 17, 1965.

Louis F. Oberdorfer, Asst. Atty. Gen., Tax Div., Ralph A. Muoio, Lee A. Jackson, David O. Walter, Attys., Dept. of Justice, Washington, D. C., for petitioner.

Edwin S. Cohen, Whitman Knapp, Donald Schapiro, Martin F. Richman, New York City, for respondent; Harold T. Quinn, Edward M. W. Hines, New York City, of counsel.

Before SCHNACKENBERG and CASTLE, Circuit Judges, and MERCER, District Judge.

MERCER, District Judge.

The single contested issue presented on this petition is the question whether a television network affiliation contract for a two-year term, which is automatically renewable, in the absence of termination by the affirmative act of either of the parties, for an unlimited number of successive two-year terms is a depreciable asset.

■ The purpose of the depreciation allowance permitted under the Code is to enable a taxpayer to recover the cost of a wasting asset used in his business by charging the diminution in the asset's value each year as a deduction from the gross income for that year. Detroit Edison Co. v. Commissioner of Internal Revenue, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286; Friend v. Commissioner of Internal Revenue, 7 Cir., 119 F.2d 959, cert. denied 314 U.S. 673, 62 S.Ct. 136, 86 L.Ed. 538. The end to be achieved "is to approximate and reflect the financial consequences to the taxpayer of the subtle effects of time and use on the value of his capital assets." Detroit Edison Co. v. Commissioner of Internal Revenue, supra, 319 U.S. at 101, 63 S.Ct. at 904.

■■ Intangible assets will not usually be a proper subject of the depreciation allowance unless the useful life of the asset is definitely limited or unless the intangible asset has value in the production of income for only a limited period of time, the duration of which can be estimated with reasonable accuracy. 26 CFR § 1.167(a) (3).[1] Although the Internal Revenue Code contains no specific reference to intangible assets in that regard, the Treasury Regulation, first adopted under the Revenue Act of 1918, remained substantially unchanged through successive reenactments of the Code and the Regulation has thereby acquired the force and effect of law. Helvering v. Winmill, 305 U.S. 79, 83, 59 S.Ct. 45, 83 L.Ed. 52; Old Mission Portland Cement Co. v. Helvering, 293 U.S. 289, 293, 294, 55 S.Ct. 158, 79 L.Ed. 367; United States v. Dakota-Montana Oil Co., 288 U.S. 459, 466, 53 S.Ct. 435, 77 L.Ed. 893.[2]

The Tax Court found that the contracts in issue were depreciable assets which could be depreciated by use of the straight line method over an estimated valuable life of twenty years. The Com-

---

1. The applicable Regulation provides:
    "If the intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. * * *" 26 CFR, Sec. 1.167(a) (3).

2. Applying the Regulation, the courts have allowed depreciation over the term thereof of the value of real estate leases and baseball player contracts, which, though renewable, could be renewed beyond the specified life of the contract only by renegotiation. E.g., Bonwit Teller & Co. v. Commissioner of Internal Revenue, 2 Cir., 53 F.2d 381, 82 A.L.R. 325; Commissioner of Internal Revenue v. Pittsburgh Athletic Co., 3 Cir., 72 F.2d 883; Helvering v. Kansas City American Assoc. Baseball Co., 8 Cir., 75 F.2d 600. Also recognized as proper subjects for depreciation have been street railway and motor coach franchises which were for fixed terms and not automatically renewable. E.g., Cleveland Railway Co. v. Commissioner, 36 B.T.A. 208; Pasadena City Lines, Inc. v. Commissioner, 23 T.C. 34.
    Examples of intangibles which have been held not to be the proper subject of a depreciation allowance are a F.C.C. broadcasting license, KWTX Broadcasting Co. v. Commissioner of Internal Revenue, 5 Cir., 272 F.2d 406; renewable liquor licenses and saloon permits, Tube Bar Inc. v. Commissioner, 15 T.C. 922, and McAvoy Co. v. Commissioner, 10 B.T.A. 1017, grazing permits, Shufflebarger v. Commissioner, 24 T.C. 980, and subscription lists, Toledo Newspaper Co. v. Commissioner, 2 T.C. 794.

missioner filed this petition to review that determination.

Taxpayer, Indiana Broadcasting Corporation, acquired all of the assets of WISH–TV in Indianapolis, and WANE–TV in Fort Wayne, Indiana, in November, 1956, by its purchase of all of the issued and outstanding stock of Universal Broadcasting Company, Inc., the prior owner of the two television stations. Among the assets acquired by the taxpayer were the two CBS [3] network affiliation contracts, one with respect to station WISH–TV and the other with respect to station WANE–TV. Each of those contracts was dated March 30, 1956, and had been renewed prior to taxpayer's acquisition of the Universal assets for terms ending, respectively, on August 18, 1958, and September 26, 1958. Each contract provided that thereafter it would be automatically renewed for additional two-year periods, unless the contract was terminated in writing by either of the parties thereto not less than six months prior to its then termination date. Both of those contracts were still in force at the time of the trial of this action.

The consideration paid by the taxpayer for the Universal assets was $11,098,-800.67. Of that amount the taxpayer allocated $4,000,000 to the CBS affiliation contract with WISH–TV and $625,000 to the CBS affiliation contract with WANE–TV. In each of its taxable years ending, respectively, on November 30, 1957, 1958 and 1959, taxpayer claimed deductions for depreciation on the $4,625,000 allocated to the CBS contracts. The Commissioner disallowed the deductions and assessed a deficiency against the taxpayer for each of those taxable years. The taxpayer filed a petition in the Tax Court for a redetermination of the deficiencies charged by the Commissioner.

At the trial below, the parties stipulated into evidence an 84–page exhibit which shows the history since 1948 of affiliation contracts of all television networks in each of 84 television market areas which had three or more television stations in operation on December 31, 1962. That exhibit showed the date when each station in each area began operation and the duration of all network affiliation contracts in each of the 84 areas.

Using that history, taxpayer's statisticians prepared a two-pronged life expectancy table, i. e., the aggregate termination experiences reflected by all NBC and CBS contracts and the selected CBS experience. The latter was based upon CBS contract experience only for periods after which in any market area there had been at least one other station in operation for at least twelve months, which was neither affiliated with NBC nor owned and operated by ABC. The latter area of experience was selected because it is limited to CBS contracts after there were sufficient stations in each particular market area to permit CBS to select between its affiliated station and at least one station which was neither owned by nor affiliated with either NBC or ABC.

Those tables showed 88 terminations of NBC and CBS affiliation contracts from 1948 through 1962, and, on the selected CBS side, 19 terminations of CBS affiliations from 1948 through 1962.

The theory of the statistical tables compiled was that an annual rate of contract termination for each pertinent period could be obtained by dividing the total number of years commenced by all of the affiliation contracts during a given period into the total number of contract terminations occurring during the same period. Using that termination rate, taxpayer's witnesses testified that the average life expectancy of any given contract could be determined by applying the Poisson-Exponential Theory of Failure. The crux of that theory is that the percentage of failure of items to which

3. The three existing television networks are designated throughout this opinion by the following initials: CBS for Columbia Broadcasting Company, and NBC for National Broadcasting Company, and ABC for American Broadcasting Company.

it is applied is a constant. For example, assuming a termination rate from the table of 5 percent per year, 95 percent of the whole group would survive at the end of one year, 5 percent of that 95 percent would fail to survive the second year and so on.

Adopting that theory, and applying it with some modification to the statistical history, the Tax Court found that an estimated useful life of the WISH and WANE CBS affiliation contracts could be determined with reasonable accuracy, and that use of the straight-line method over 20 years was a reasonable basis for depreciation of the contracts.

We think that the Tax Court erred in its findings that an estimated useful life of these contracts could be determined with reasonable accuracy.

The validity of the statistical analysis is more apparent than real because the analysis ignores the facts of life of the television broadcasting industry. Factors must be taken into account which show conclusively that these affiliation contracts, while in force, are not only not wasting assets but are assets of a constant, or even expanding, value. There are also factors which argue strongly for the perpetual duration of the contracts, at best, or at least for a wholly unpredictable life. We think those factors which we hereinafter explore show that each contract is more unique than generic, which makes it questionable whether any meaningful general experience could ever be shown.

There are 12 VHF[4] channels and 70 UHF[4] channels available upon which television broadcasting stations may operate. Those channels are variously allocated by the FCC[5] to particular cities or broadcast areas upon the basis of population and other factors. Each such channel may be utilized for commercial broadcasting pursuant to licenses granted to applicants by the FCC.

In 1945 there were 6 commercial television stations operating within the continental United States, all VHF. By September, 1948, the number of VHF stations had increased to 108, at which point a period of time known in the industry as "the freeze" began. From September, 1948, to July 1, 1952, the freeze period, the FCC processed no applications for television broadcasting licenses. The number of VHF commercial stations increased each year after the freeze was lifted to a total of 474 stations as of January 1, 1963.

UHF licensing was first authorized by the FCC at the end of the freeze, and the number of the UHF channels in actual use has been variable, but limited.[6]

Relevant to this case the FCC allotted to Indianapolis four VHF channels, all now in use, and three UHF channels, none of which is in use. Fort Wayne was allotted four UHF channels, three of which are now on the air. WISH–TV began operating on July 1, 1954, and WANE–TV[7] began operating in September, 1954.

The revenue of television broadcasters is derived from charges for broadcast time paid by advertisers. The rates charged by stations for advertising time vary from area to area, and from station to station within a given area, according to the estimated size of the audience of the particular station. The charges of a single station may vary according to its usual audience for different hours of the day. Therein lies the value of network affiliation; attractive programs draw a large audience, a large audience attracts advertisers and advertisers are revenue.

4. Very High Frequency; Ultra High Frequency.

5. Federal Communications Commission.

6. Because few early television receivers were equipped to receive UHF broadcasts, UHF stations in operation reached a high of 121 stations in 1954, and then declined in number to 76 stations in 1960. By January 1, 1963, the number of such stations had increased to 90 under the impetus of legislation and rules requiring all channel capability for new television receivers.

7. First licensed as WINT-TV.

The sources of available programming are three-fold, namely, locally produced programs, motion pictures and other filmed material purchased by a station from distribution sources other than the networks and network programming. The latter is of two types, namely, sponsored network programs and non-sponsored, or sustaining, programs furnished by the networks to their affiliated stations.

Throughout the history of television, network programs have been the most valuable source of programming for a station. Their value is three-fold. First, network programming tends to have a national audience appeal which attracts a large number of viewers. Secondly, network programs are delivered to affiliated stations without charge,[8] whereas a non-affiliated station must produce or purchase all program material at substantial cost.[9] Finally, it is frequently impossible for a non-affiliated station to buy programming at any cost which can compete effectively against the network programs.

At all material times, CBS was the dominant network in audience appeal, with NBC and ABC following in that order.

Thus a network affiliation contract is something of value, and a CBS affiliation contract is something of the greatest value in any given market area.[10] At the time of the trial of this case, the value of a CBS contract was essentially equivalent to the value of all of the other combined assets of an operative station owning such a contract.

It seems, therefore, certain that any non-affiliated station now on the air, or any station which might begin operating, in taxpayer's market areas would covet taxpayer's affiliation contracts. However, the side of the slate which taxpayer's witnesses omitted from their opinion testimony, and which we believe the court below omitted from its evaluation of the evidence, militates strongly against the success of any covetous overtures to CBS by any competing station.

The first element which the court below overlooked is the state of flux which has affected this young industry,[11] with its consequent effect upon the industry history of contracts. Through the freeze period it was not uncommon for a single station to have affiliation contracts with two or more networks.[12] There simply were not enough stations in many areas, and the networks found outlets for their programs where they could, even if they had to share the spotlight with one or more competing networks. As new stations came on the air after the freeze a large number of affiliation contracts were terminated as the networks sought exclusive area affiliations. In the period 1953 to 1955 which immediately followed the freeze 49 NBC and CBS contracts were terminated.[13] All of those terminations entered into the statistical analysis of the aggregate experience and many of them affected the selected CBS statistics. The stipulated exhibit strongly suggests

8. There is no charge for programming, except that for recorded programs, the networks do charge the affiliated station for the recording furnished.

9. In a given market area, the cost of the operation of various stations, exclusive of the cost of programs, is substantial and approximately equivalent. This factor then has a very real bearing upon the profits to be realized by a station.

10. Assuming all others factors to be equal, including the facilities to reach an audience, the Indianapolis experience of 1958 indicates a basis for comparison. In that year. WISH-TV had net income of $1,-195,695, as compared to $754,000 for the

NBC affiliate, $199,777 for the ABC affiliate and a loss of $241,293 for a non-affiliated station.

11. Though a few stations began commercial operation in 1945, 1948 may be called the year of the birth of the industry.

12. WISH-TV was affiliated with NBC, ABC and the now inoperative Dumont Network, as well as with CBS, in its first year of operation. WANE-TV was affiliated with both CBS and ABC from 1954 to 1957.

13. That number represents about 55 percent of the terminations considered in compiling the life expectancy tables adopted by the court below.

that the period of flux yet continues in the industry, and that it colors the industry history to such an extent that there is grave doubt that any reliable norm of contract expectation could be found at this time. We think it certain that any such norm built upon the evidence in this case would be pure guesswork, and we see no statistical validity in the life expectancy tables upon which the decision below rests.

It is likewise clear that the stipulated exhibit graphically refutes the existence of a basic premise upon which the Poisson theory relies, namely, that the life expectancy of all contracts is the same regardless of the length of duration of the contract. Of the 88 contract terminations included in taxpayer's aggregate experience analysis, 50 percent were terminated before they had been in force for four years, and 80 contracts, or approximately 91 percent of the group, were terminated before they had been in force for seven years.[14] Only three of those contracts were terminated after they had been in force for more than nine years. Of those three, one was terminated by the local station, not by the network. A second, terminated by CBS, was the contract of a station affiliated with both CBS and NBC, and located in a market area in which CBS had then contracted an exclusive affiliation with another station. The record contains no hint as to the background for the termination of the third of those contracts. The summary of industry history is undoubtedly subject to varying interpretations, each of arguable validity, but we think it necessary to conclude that the premise that a contract in its ninth year, for example, is no more immune from termination than is a contract in its first year is not one of such arguable interpretations. A very high degree of stability is reflected in the history of contracts which have continued in force for more than eight or nine years. Whatever its worth in other areas, the Poisson-Exponential theory has no application in this case.

Another factor which taxpayer's statistician did not consider at all [15] and a factor which the court below largely overlooked, is the CBS policy in the renewal of its contracts.

CBS policy, as outlined by a network bulletin in evidence, stresses "present affiliation with a station" as a "substantial factor" governing the CBS decision when any contract is ripe for renewal because of general business considerations and because an audience tends to associate the network with its established outlet. CBS is "reluctant to disturb" the existing affiliation, and, unless a new station shows "substantial superiority in significant areas, the fact of present affiliation controls."

Factors deemed significant by CBS in determining questions of affiliation with a local station are the station's clearance of network programs for broadcast,[16] the qualifications of management, including newspaper ownership of the station, multiple station ownership and location of the station in the principal city of its market area.

The record reveals that taxpayer is managed by experienced persons in the field, and that it is owned in common with the New York Herald-Tribune and three other corporations operating television stations in Tulsa, Houston and

---

14. No reason for termination is shown as to any of those contracts, though the timing of the termination does suggest that a very substantial number of them were terminated when exclusive affiliation facilities first became available to the networks.

15. He professed to have no knowledge of the television industry in general and of network affiliation practices in particular. He testified that he based his evalu-

ation and testimony solely upon the data contained in the contract-history exhibit.

16. Non-clearance and delay of broadcast of network programs evidencing a disinterest in those programs which unreasonably impairs the ability of CBS to serve national advertisers will "generally" outweigh the disadvantages of disrupting an existing relationship because of the network's need "to effect substantial clearance."

Sacramento.[17] Its stations are located in the principal cities of its respective market area.[18] Its stations have a record of broadcasting network programs about 63 percent of their total broadcast time and during an average 95 percent of the "prime time" hours.[19] Though the factor of contemporaneous ownership of CBS-affiliated radio facilities is now considered inconsequential by CBS, it may be noted that taxpayer operates radio stations affiliated with CBS in both Indianapolis and Fort Wayne.[20]

Clearly taxpayer attached substantial significance to the renewal prospects of its contracts and purchased the stations with the expectation that the contracts would be continued in force indefinitely. It appears that that expectation will be realized by it in the light of the already substantial duration of the contracts and of pronounced CBS policy governing contract renewals. There is nothing to suggest that CBS will change its policy, or that at any reasonably predictable time the one party or the other will cause the contracts to be terminated. Moreover, unlike an asset having a declining value with the passage of time, these contracts probably will have a constant value, or even an increasing value, in years to come.

In the single previous case dealing with the issue before us it was held that the taxpayer had failed to adduce any evidence to prove that network af-

filiation contracts had a useful life capable of reasonable calculation. Westinghouse Broadcasting Co. v. Commissioner, 36 T.C. 912, aff'd 3 Cir., 309 F.2d 279, cert. denied 372 U.S. 935, 83 S.Ct. 881, 9 L.Ed.2d 766. Taxpayer argues that the stipulated industry-history exhibit supplies the deficiency held to exist in Westinghouse. There is no merit to that position. That exhibit suggests, and the record as a whole persuasively indicates, that taxpayer's contracts may be expected to remain in force for a wholly unpredictable period of time.

We think that a close analogy to this case is found in Nachman v. Commissioner of Internal Revenue, 5 Cir., 191 F.2d 934. There the taxpayer paid $8,000 for a city liquor license having five months of a one-year term unexpired. Although the license itself contained no provision relative to renewal, the evidence indicated that the city, in issuing licenses from year to year, gave preference to holders of existing licenses over other applicants for the limited number of licenses authorized. The court affirmed the Tax Court's decision holding, inter alia, that the license was indefinite in duration and, therefore, a non-depreciable capital asset.

The Nachman rationale was applied in Gant v. Commissioner of Internal Revenue, 6 Cir., 263 F.2d 558,[21] KWTX Broadcasting Co. v. Commissioner of Internal Revenue, 5 Cir., 272 F.2d 406,[22]

17. All of those stations are affiliated with CBS under contracts ranging in date from November, 1949, to March, 1955.

18. Of present significance, the only non-affiliated station in the Indianapolis market area is located outside the City of Indianapolis. The record reveals that that station has had contracts with NBC and ABC terminated for that reason as new stations began broadcasting from Indianapolis, the central city of the market area.

19. From 7:30 p.m. through 11:00 p.m.

20. Whatever significant relationship the selected CBS experience may bear to taxpayer's situation, particularly in Indianapolis, the table is meaningless because it

lacks any reference to the cardinal factor of the reason for the several terminations included therein. Without knowledge of the reason for each contract termination, there is totally lacking any basis for the comparison of taxpayer's situation to the situation which evoked any of those several CBS terminations.

21. That case involved a gasoline distributorship agreement for a fixed term which contained no specific renewal covenant except the customary usage in the trade.

22. This case involved a three year FCC license to operate a television station, and the factor that the FCC had never refused to renew an existing license.

and Coca-Cola Bottling Co. v. Commissioner of Internal Revenue, 6 B.T.A. 1333.[23]

 We think that the reasoning of those cases is sound and that the present case cannot be factually distinguished therefrom. Where there is no reasonable basis for the prediction of the expected valuable life of an intangible asset, it follows that the asset is not the proper subject of depreciation allowance.

 The Tax Court's findings that the estimated useful life of these contracts is ascertainable with reasonable certainty and that these contracts are depreciable assets are clearly erroneous. The decision of the Tax Court is therefore reversed.

Reversed.

---

23. This case involved a Coca-Cola franchise with no guarantee of renewal except industry practice.