COMMERCIAL CREDIT INDUSTRIAL CORP. (FORMERLY AUTO FLEET LEASING, INC.), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 393–65. Filed December 16, 1966.

---

*Crane C. Hauser*, for the petitioner.
*Herbert A. Seidman*, for the respondent.

ARUNDELL, *Judge:* Respondent determined a deficiency in income tax for the calendar year 1961 in the amount of $128,057.39.

The issue is whether the cost to petitioner in 1961 of $260,257.96 for 5,000 shares of capital stock of Commercial Credit Co., which stock petitioner transferred in 1961 to Greyhound Rent-A-Car, Inc., pursuant to a second amendment to an agreement of sale entered into in 1959 between petitioner's assignor and Greyhound, represented the purchase price of an indivisible intangible asset such as goodwill, going-concern value, etc., having an indeterminable useful life, not amortizable, or whether the said cost of the stock represented the purchase price of outstanding leases of the motor vehicles purchased from Greyhound in 1959 and amortizable over the life of the leases.

## FINDINGS OF FACT

Most of the facts were stipulated and are incorporated herein by reference.

Petitioner is a corporation organized under the laws of the State of Delaware on January 9, 1959. It was initially incorporated under the name Auto Fleet Leasing, Inc., which name was subsequently changed to Commercial Credit Industrial Corp. Its principal office is at 300 St. Paul Place, Baltimore, Md.

Petitioner kept its books and made its income tax returns on the accrual method of accounting, and used the calendar year as its taxable year for the taxable periods here involved.

Petitioner's income tax returns for 1959, 1960, and 1961 and its amended income tax returns for 1959 and 1960 were filed with the district director of internal revenue at Baltimore, Md. The dates of filing of these returns and the taxable income (losses) shown on the returns are as follows:

| Year | Date filed | Taxable income (losses) |
|---|---|---|
| 1959 | Sept. 15, 1960 | ($155, 571. 73) |
| 1959 (amended) | June 14, 1962 | (311, 138. 30) |
| 1960 | June 15, 1961 | (47, 494. 72) |
| 1960 (amended) | June 14, 1962 | (109, 200. 73) |
| 1961 | June 15, 1962 | (20, 174. 78) |

Petitioner is engaged in the business of leasing motor vehicles and related equipment. All of petitioner's capital stock, consisting of 20,000 shares of common of $100 par value, is owned by Commercial Credit Co., a Delaware corporation, hereinafter referred to as Com-

mercial of Delaware, engaged through its subsidiary corporations in finance, insurance, and manufacturing businesses.

In 1958 the management of Commercial of Delaware was informed that Greyhound Rent-A-Car, Inc., a Delaware corporation, hereinafter referred to as Greyhound, desired to sell the assets of its fleet-leasing division which had been losing money.

The management of Commercial of Delaware wanted to get into the fleet-leasing business and determined that it would be to its advantage to purchase the already established fleet-leasing division of Greyhound. Accordingly, negotiations were initiated with Greyhound on behalf of Commercial Credit Corp., a Maryland corporation, hereinafter referred to as Commercial of Maryland, all of whose capital stock was owned by Commercial of Delaware. (Note: As will hereinafter be shown, Commercial of Maryland becomes petitioner's assignor.)

On January 8, 1959, an agreement of sale was entered into between Greyhound as seller and Commercial of Maryland as purchaser, under which Greyhound agreed to sell to Commercial of Maryland all of the motor vehicles and plant equipment owned by Greyhound on December 31, 1958, which were then under lease to third parties pursuant to "finance leases," full "maintenance leases," "net leases," or "lease sales"; the leases relating to such vehicles and equipment; the accounts receivable and other sums owing on such leases; all vehicles owned on such date which had previously been subject to such leases; all vehicles used by the personnel of Greyhound's leasing division; all 1959 vehicles purchased for leasing purposes and paid for; all insurance policies relating to such vehicles and equipment; and various items of furniture and fixtures, plant equipment, working funds, and materials and supplies to be agreed upon.

Under said agreement of sale, Commercial of Maryland agreed to pay a purchase price, divided into three components as follows:

(1) As of the "Closing Date," December 31, 1958, Commercial of Maryland agreed to pay Greyhound an amount equal to the sum of the depreciated book value of the purchased vehicles and equipment, the book value of the accounts receivable, the cost of unexpired insurance on the vehicles and equipment, the cost of deferred charges for taxes and licenses, and an agreed amount for furniture, fixtures, and supplies; less the sum of a reserve for bad debts, as determined by Greyhound's independent public accountants, a reserve for refunds under maintenance leases, as determined by Greyhound's independent public accountants, a reserve for losses on the resale of vehicles in the amount of $227,000, and all credit balances and advance payments made by customers on leases.

(2) At 6-month intervals following the closing date, Commercial of Maryland agreed to review the reserves for bad debts, refunds on

maintenance leases, and losses on resale of vehicles; Greyhound agreed to pay to Commercial of Maryland any deficiency from time to time in such reserves; and Commercial of Maryland agreed to pay to Greyhound any excess in such reserves up to the aggregate amount of $200,000, and 65 percent of any remaining excess in such reserves.

(3) Under section 12 of the said agreement of sale Commercial of Maryland agreed to pay to Greyhound for each of the years 1959 through 1963 *a further sum as additional purchase price*, computed as follows: [1]

Said further sum shall be computed by deducting it from the net profit before Federal income taxes, as computed under Section 11, computing the Federal income tax of the Purchaser's Affiliate [petitioner] on the difference, deducting the Federal income tax so determined from the net income before taxes as computed under Section 11, and one-half of the final remainder so determined shall be said further sum to be paid to Seller.

Said agreement also provided that two nominees of Greyhound would be elected from time to time as members of petitioner's board of directors until December 31, 1963, and that Greyhound and its affiliates would not engage in the fleet-leasing business for a period of 5 years.

On January 31, 1959, Commercial of Maryland assigned all its right, title, and interest in said agreement to petitioner and petitioner assumed all of Commercial of Maryland's liabilities and obligations thereunder.

In accordance with section 6 of said agreement of sale, Greyhound submitted to petitioner, on or about February 7, 1959, a statement of assets and liabilities applicable to Greyhound's leasing operation as of December 31, 1958. Because of difficulties encountered in verifying Greyhound's accounts receivable and vehicles and equipment accounts, Greyhound's independent public accountants were unable to certify such statement, as required by section 6 of said agreement of sale.

On February 16, 1959, in consideration of petitioner's agreement to waive its right under said agreement of sale to receive said certified statement, the Greyhound Corp., a Delaware corporation which owned all the capital stock of Greyhound, executed a guarantee and indemnity that the losses and loss expenses relating to notes and accounts receivable would not exceed $450,000 and that the vehicles shown on the statement furnished by Greyhound to petitioner were under leases to third parties on December 31, 1958.

---

[1] As provided under sec. 12 of the said agreement of sale, component (3) is somewhat involved. After two amendments to the said agreement of sale, as hereinafter mentioned, it was agreed that petitioner would pay Greyhound in 1961 as component (3) of the purchase price 5,000 shares of common stock of Commercial of Delaware, which stock cost petitioner $260,257.96. The cost of this stock is what presents the "issue" with which we are concerned.

On February 16, 1959, Greyhound transferred to petitioner the assets subject to said agreement of sale, and petitioner paid Greyhound the initial payment (*exclusive of the further sum to be paid as the third component under sec. 12* of the said agreement of sale) of $23,625,242.66 for the assets purchased, as required under said agreement of sale. The following schedule sets forth in detail the assets purchased and the amounts recorded in petitioner's books of account as the initial payment for such assets:

| Assets purchased | Number of vehicles | Vehicles and equipment | | Other assets and liabilities | Net book value |
|---|---|---|---|---|---|
| | | Cost | Depreciation | | |
| Vehicles and equipment: | | | | | |
| Full-maintenance lease autos | 3,919 | $9,702,911.50 | $2,955,615.36 | --------- | $6,747,296.14 |
| Full-maintenance lease trucks | 81 | 280,481.62 | 71,799.13 | --------- | 208,682.49 |
| Net lease autos | 2,391 | 7,398,651.18 | 2,264,232.44 | --------- | 5,134,418.74 |
| Net lease trucks | 151 | 417,372.26 | 121,320.92 | --------- | 296,051.34 |
| Finance lease autos | 2,310 | 6,071,561.21 | 1,704,073.61 | --------- | 4,367,487.60 |
| Finance lease trucks | 166 | 510,551.04 | 152,948.87 | --------- | 357,602.17 |
| Lease-sale autos | 396 | 1,268,803.67 | 451,721.09 | --------- | 817,082.58 |
| Lease-sale trucks | 86 | 197,827.74 | 75,791.29 | --------- | 122,036.45 |
| RA (full-maintenance lease) autos | 3,149 | 6,736,864.36 | 1,898,319.84 | --------- | 4,838,544.52 |
| RA (full-maintenance lease) trucks | 26 | 47,613.51 | 14,911.21 | --------- | 32,702.30 |
| 52 unclassified autos | -------- | 129,972.45 | 39,356.03 | --------- | 90,616.42 |
| | 12,675 | 32,762,610.54 | 9,750,089.79 | --------- | 23,012,520.75 |
| Leased plant equipment | -------- | 52,252.00 | 12,344.54 | --------- | 39,907.46 |
| 9 company cars | -------- | 29,274.41 | 6,058.33 | --------- | 23,216.08 |
| | | 32,844,136.95 | 9,768,492.66 | --------- | 23,075,644.29 |
| Reserve for losses on resale of vehicles | -------- | ----------- | ---------- | ($227,000.00) | (227,000.00) |
| | | | | | 22,848,644.29 |
| Accounts and notes receivable: | | | | | |
| Lease accounts | | | | 1,462,203.58 | |
| Notes receivable | | | | 3,029.84 | |
| | | | | 1,465,233.42 | |
| Reserve for losses on collections | | | | (450,000.00) | 1,015,233.42 |
| Prepaid expenses and advances to employees: | | | | | |
| Delivery expense | | | | 58,161.65 | |
| Taxes and licenses | | | | 57,727.63 | |
| Employee travel advances | | | | 2,250.00 | 118,139.28 |
| Furniture, fixtures, and supplies | | | | 45,000.00 | 45,000.00 |
| Liabilities and additional reserves: | | | | | |
| Advance payments on leases | | | | (201,774.33) | |
| Reserve for maintenance refunds | | | | (200,000.00) | (401,774.33) |
| | | | | | 23,625,242.66 |

In addition to the said initial payment of $23,625,242.66, petitioner paid Greyhound on February 16, 1959, in accordance with section 8.1 of the said agreement of sale, a rounded amount called "Advance" of $600,000 (rounded from a computed amount of $587,782), thus making the total payment on February 16, 1959 (*exclusive of any*

*payment for the third component*), the amount of $24,225,242.66. This rounded amount of $600,000 was to reimburse Greyhound for its actual expenses incurred in operating the leasing business for the account of petitioner from the "Closing Date" December 31, 1958, to the "Closing" February 16, 1959.

Under the said agreement of sale, the petitioner acquired all of Greyhound's fleet leases. The leases were assigned in bulk to petitioner by Greyhound. When petitioner acquired the leases from Greyhound, it intended and hoped to retain the profitable ones.

On March 13, 1959, petitioner and the Greyhound Corp. (parent of Greyhound) entered into an agreement of sale under which petitioner agreed to purchase all the outstanding capital stock of R. A. Auto Leasing Ltd., a Canadian corporation engaged in the fleet-leasing business in Canada, for a price of $336,824.23, plus (under sec. 3) additional obligations not material here.

Of the 12,736 vehicles, including the 52 unclassified automobiles and the 9 company cars, which Greyhound represented that it owned on December 31, 1958, for which petitioner made the initial payment of their net book value as of that date on February 16, 1959, 12,675 vehicles were on lease to lessees of Greyhound under four basic types of lease arrangements:

(a) 7,068 automobiles and 107 trucks, having an aggregate net book value of $11,827,225.45, were on full-maintenance leases, which in general provided for the payment by the lessee of a stipulated monthly rental for a stipulated number of months, with the lessor being obligated to bear all normal maintenance expenses. Upon the termination of such leases, the leased vehicles were to be returned to the lessor, and the lessor would realize the profit or sustain the loss on the disposition of the vehicles. Some of the full-maintenance leases provided for refunds to the lessees in the event the mileage did not exceed a certain amount, or in the event the maintenance costs did not exceed certain amounts.

(b) 2,391 automobiles and 151 trucks, having an aggregate net book value of $5,430,470.08, were on net leases, which were similar in all respects to the full-maintenance leases except that the lessee was responsible for all maintenance expenses.

(c) 2,310 automobiles and 166 trucks, having an aggregate net book value of $4,725,089.77, were on finance leases, which in general provided for the payment by the lessee monthly of a percentage of the capitalized cost of the vehicles, which percentage was based on the monthly depreciation rate of the vehicles, plus a percentage to compensate the lessor. A markup of from $100 to $250 per vehicle was ordinarily included in the capitalized cost of each vehicle. Upon the termination of a finance lease with respect to a vehicle, the vehicle

was returned to the lessor and disposed of. Any excess of the proceeds of disposition over the depreciated capitalized cost of the vehicle was remitted to the lessee, and if the depreciated capitalized cost exceeded the proceeds of disposition, the lessee was billed for the difference. In general, the minimum lease term for a vehicle under a finance lease was 1 year. The lessee was responsible for all maintenance expenses.

(d) 396 automobiles and 86 trucks, having an aggregate net book value of $939,119.03, were on lease-sales, which provided for the payment by the lessee of a stipulated monthly rental for a stipulated term of months, the lessee being obligated to pay all maintenance expenses. At the end of the lease term, the lessee had an option to acquire the vehicle for $1, plus any taxes the lessor was required to pay on account of such sale.

After the closing of the agreement of sale on February 16, 1959, petitioner sent a manager and a staff to Cleveland, Ohio, to take charge of the Greyhound fleet-leasing business. At that time Greyhound had approximately 110 employees engaged in the operation who were initially employed by petitioner. In the summer of 1959 the business was moved to Baltimore, Md. By that time approximately 20 of the former Greyhound employees remained in the employment of petitioner.

A disagreement subsequently arose between Greyhound and petitioner with respect to the method of computation of the second and third components of the purchase price for the assets under sections 4, 11, and 12 of said agreement of sale.

In order to resolve this controversy, on May 9, 1960, an amendment to said agreement of sale was executed by Greyhound, Commercial of Maryland, and petitioner. Regarding the disagreement with respect to the second component of the purchase price, the said amendment provided that petitioner would pay Greyhound the sum of $200,137.05 [2] as a depreciation differential on certain vehicles that were returned to petitioner by the lessees. With regard to the third component of the purchase price, the said amendment provided that the net profits of petitioner to which Greyhound was entitled under section 12 of said agreement of sale would be paid as a single sum rather than annually, and that the period for which such net profits would be computed would be 1959 through 1965 rather than 1959 through 1963.[3]

[2] This payment of $200,137.05 is material to the present issue only in that petitioner amortized this amount over the life of the particular leases in a somewhat complicated computation; claimed and was allowed the amortized amounts as deductions from income; and then later amortized the amount here in dispute ($260,257.96) in the same manner as it did concerning the $200,137.05.

[3] This amendment regarding the third component of the purchase price becomes immaterial to the present issue by reason of the second amendment to the said agreement of sale, hereinafter mentioned, entered into on Nov. 22, 1961.

On November 22, 1961, Greyhound, Commercial of Maryland, and petitioner executed a second amendment to the agreement of sale dated January 8, 1959, under which petitioner agreed, in settlement of its obligation to pay the third component of the purchase price provided for in section 12 of said agreement of sale, to deliver to Greyhound 5,000 shares of common stock of Commercial of Delaware; and Greyhound agreed to deliver to petitioner the resignation of its two nominees on petitioner's board of directors.[4] Petitioner purchased 5,000 shares of stock of Commercial of Delaware at a total cost of $260,257.96, and transferred them to Greyhound.

Also, on the same date, November 22, 1961, the Greyhound Corp. (parent of Greyhound), petitioner, and Commercial of Maryland entered into an agreement whereby, "In consideration of the execution of the foregoing agreement" (the agreement between Greyhound, Commercial of Maryland, and petitioner, dated Nov. 22, 1961) —

The Greyhound Corporation, a Delaware corporation with its executive offices at Chicago, Illinois, hereby

(i) consents to the execution of the foregoing agreement and agrees that the same in no way shall modify or affect any of its obligations as guarantor to Commercial Credit Corporation (Purchaser) or to Auto Fleet Leasing, Inc. (Purchaser's Affiliate), and

(ii) unconditionally releases and discharges said Auto Fleet Leasing, Inc., from any and all obligations presently existing under or by virtue of Section 3 of the Agreement of Sale dated the 13th day of March, 1959, between Auto Fleet Leasing, Inc., and Undersigned, covering the sale by the latter to the former of all of the issued and outstanding shares of the capital stock of R. A. Auto Leasing Limited, a Canadian corporation with its executive offices at Toronto, Canada, and agrees that said Section * * * of said Agreement of Sale hereby are made void and of no effect, and deleted.

Petitioner prorated the payment of $260,257.96 on the basis of the percentages developed for the allocation of the prior payment of $200,137.05 made to Greyhound, and amortized the payment on its

---

[4] The exact words of the second amendment were, in part, as follows:

"1. Effective as of the date hereof, said Agreement of Sale, as heretofore amended, hereby is amended further, as follows:

\* \* \* \* \* \* \*

"1(c). Seller [Greyhound] hereby unconditionally releases and discharges Purchaser [Commercial of Maryland] and Purchaser's Affiliate [petitioner] from any and all obligations presently existing under or by virtue of Section 12, and said Section hereby is made void and of no effect, and deleted. * * *

"2. Prior to December 1, 1961, (i) Purchaser's Affiliate will cause to be registered in the name of and delivered to Seller, *as additional purchase price for the assets covered by said Agreement of Sale,* five thousand (5,000) shares of Common Stock of Commercial Credit Company, a Delaware corporation, of the par value of $5. per share, and (ii) Seller will deliver to Purchaser's Affiliate the resignations from Purchaser's Affiliate's Board of Directors of the two nominees thereon of Seller.

"3. Except as amended by said agreement dated the 9th day of May, 1960, and by this Second Amendment, said Agreement of Sale shall remain in full force and effect, in accordance with its original terms."

[Emphasis supplied.]

books and records and claimed deductions in its Federal income tax returns as follows:

| Year | Amount |
|------|--------|
| 1959 | $118, 520. 96 |
| 1960 | 104, 108. 38 |
| 1961 | 36, 084. 77 |
| 1962 | 1, 543. 85 |
| | 260, 257. 96 |

Respondent disallowed the amortization deductions claimed with respect to such payment of $260,257.96 for the years 1959, 1960, and 1961 in the amounts of $118,520.96, $104,108.38, and $36,084.77, respectively. This resulted in the reduction of petitioner's net operating loss carryover from 1959 and 1960 to 1961 of $420,339.03 to $197,709.69, and the reduction of petitioner's amortization deduction for 1961 in the amount of $36,084.77.

No part of said payment of $260,257.96 was allocable to Greyhound's covenant not to compete under said agreement of January 8, 1959.

There were 3,330 lessees of the 12,675 leased vehicles purchased from Greyhound as of January 1, 1959. On January 1, 1963, 74 of these lessees were lessees of petitioner, leasing 4,671 vehicles. In the intervening period petitioner acquired 232 new lessees, leasing 5,764 vehicles.

### ULTIMATE FINDING

The sum of $260,257.96 represented the purchase price of an indivisible intangible asset having an indeterminable useful life.

### OPINION

Petitioner contends that the payment in 1961 of $260,257.96 for the 5,000 shares of capital stock of Commercial of Delaware represents the purchase price of the outstanding leases of the motor vehicles purchased from Greyhound in 1959; that such purchase price represents the excess value of the leases over the fair market value of the leased vehicles; and that such purchase price is amortizable over the life of the leases under section 167(a)(1), I.R.C. 1954,[5] and section 1.167(a)–3 of the Income Tax Regulations.[6] In other words, peti-

---

[5] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, * * *

[6] Sec. 1.167(a)–3 Intangibles.

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the

tioner apparently concedes that in payment of the third component of the purchase price of "the assets covered by said Agreement of Sale" (quoted matter from second amendment dated Nov. 22, 1961) it acquired an "intangible asset" but contends that it was such an intangible asset which is the subject of a depreciation allowance.

On the other hand, the respondent, in his brief, asserts:

Petitioner amortized the $260,257.96 payment on its books, and for the years 1959 to 1962, inclusive, claimed deductions of $118,520.96, $104,108.38, $36,084.77, and $1,543.85, respectively. The respondent has disallowed the deductions claimed on the grounds (1) that the $260,257.96 represented an amount paid for "goodwill" or "going concern value", or (2) that the $260,257.96 represented the value of fleet leases acquired from Greyhound which fleet leases had an indeterminate useful life, or (3) that the $260,257.96 represented, in part, additional purchase price of R. A. Auto Leasing, Ltd. stock.

Each of the three grounds relied upon by respondent represents a different alternative. However, in his brief respondent states that "to some degree" grounds 1 and 2 overlap. It would seem that this is true.

Under these opposing contentions we must determine what intangible asset petitioner acquired by the payment of the third component of the purchase price and whether the cost of such intangible asset is the subject of a depreciation allowance.

In the fall of 1958 Commercial of Delaware wanted to get into the fleet-leasing business. Its management was informed that Greyhound desired to sell the assets of its fleet-leasing division which had been losing money. Commercial of Delaware thought it would be more to its advantage to acquire a going business, with existing lessees, than to buy a fleet of new automobiles and start from "scratch" in acquiring new lessee customers. Accordingly, after initial negotiations, an agreement of sale was entered into on January 8, 1959, between Greyhound, as seller, and Commercial of Maryland, as purchaser, the details of which are set out in our findings. On the next day, January 9, 1959, petitioner was incorporated to engage in the fleet-leasing business, and on January 31, 1959, Commercial of Maryland assigned all of its rights in the agreement with Greyhound to petitioner. The "Closing" of the agreement occurred on February 16, 1959, when petitioner paid Greyhound $24,225,242.66 for the first two components of the purchase price. The third component of the purchase price was provided for in section 12 of the agreement of sale (see fn. 1) and was to be paid over the years 1959 through 1963, if there were profits in those years. Under the agreement of sale, petitioner was able to com-

---

useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. * * *

mence the fleet-leasing business immediately with 3,330 existing lessees of 12,675 leased vehicles.

After two amendments to the said agreement of sale of January 8, 1959, made on May 9, 1960, and November 22, 1961, respectively, petitioner, under the second amendment, agreed to pay Greyhound in 1961, as full payment of component 3 of the purchase price, 5,000 shares of common stock of Commercial of Delaware, which stock cost petitioner $260,257.96.

At no place in the original contract of January 8, 1959, nor in the two amendments thereto, is it provided that the third component of the purchase price of the assets of the fleet-leasing division of Greyhound is for the leases alone. Section 12 of the original contract provided that "Purchaser will pay Seller or its nominee, *annually*, for the years 1959 to *1963*, both inclusive, *a further sum as additional purchase price*." (Emphasis supplied.) The first amendment changed section 12 to read in part: "Purchaser will pay Seller or its nominee *a further sum as additional purchase price* determined by the operating profit, if any, of Purchaser's Affiliate during the period from January 1, 1959 to December 31, *1965*. * * * Payment of said additional purchase price shall be made * * * not later than April 30, 1966." (Emphasis supplied.) The second amendment provided in part that section 12 "is made void and of no effect, and deleted. [and] * * * Prior to December 1, 1961, (i) Purchaser's Affiliate will cause to be registered in the name of and delivered to Seller, *as additional purchase price for the assets covered by said Agreement of Sale*" the said 5,000 shares of Commercial of Delaware. [Emphasis supplied.]

It would seem when petitioner acquired the automobiles from Greyhound that it must have taken them subject to the lease agreements and, while the leases may be regarded as separate property by the lessees, they were simply contracts to pay an agreed rental insofar as petitioner was concerned. One of the terms of the contract of purchase was that petitioner should not only pay as its cost the depreciated book value of the automobiles but should in some way reimburse Greyhound for its cost of securing the leases.[7] This cost was not

---

[7] At the hearing, petitioner offered the testimony of Edmund L. Grimes, who was chairman of the boards of Commercial of Maryland and Commercial of Delaware. Grimes testified that, acting for Commercial of Maryland, he and one Ackerman, acting for Greyhound, negotiated the transaction here in question. Ackerman was president of Greyhound. When asked to explain the third component of the purchase price, Grimes, in his testimony, said:

"Now this is the part that may confuse you. He [Ackerman] said 'I spent a lot of money acquiring those leases, either by paying commissions to men or in my sales organization. You are going to get the income from those leases. I believe I should be reimbursed for some of the expenses that I spent to get that income.' And I [Grimes] said

carried on Greyhound's books but the amount to be paid was resolved, in the first instance, by giving Greyhound a portion of the profits that would be earned, and this was later modified so as to give Greyhound 5,000 shares of capital stock of Commercial of Delaware which petitioner in fact acquired at a cost of $260,257.96. This was a lump sum and there was no apportionment of it among the several automobiles or groups of automobiles acquired by petitioner so as to determine in what manner any depreciation should or could be allowed.

We have found as an ultimate fact that this lump sum represented the purchase price of an indivisible intangible asset having an indeterminable useful life. As such, the respondent contends it is not subject to depreciation under such cases as *The Danville Press, Inc.*, 1 B.T.A. 1171; *U.S. Industrial Alcohol Co.*, 42 B.T.A. 1323 (issue I), affirmed as to issue I, but affirmed and reversed and remanded as to other issues, 137 F. 2d 511 (C.A. 2, 1943); *Thrifticheck Service Corp.*, 33 T.C. 1038, affd. 287 F. 2d 1 (C.A. 2, 1961), *Richard M. Boe*, 35 T.C. 720, affd. 307 F. 2d 339 (C.A. 9, 1962); and *Westinghouse Broadcasting Co.*, 36 T.C. 912 (issue 2), affirmed as to issue 1 only, 309 F. 2d 279 (C.A. 3, 1962).

What has come to be known as the "indivisible asset rule" had its beginning in the last sentence of the opinion in *The Danville Press, Inc., supra.* In that case the taxpayer began business on November 1, 1919, when it purchased all the assets of a predecessor newspaper-publishing company for $160,000 cash. Among the assets acquired were 9,000 subscriptions which expired from 1 to 12 months. It was agreed between the seller and the purchaser that of the total purchase price $36,000 should be allocated to the 9,000 subscriptions and $20,000 to goodwill. The taxpayer claimed the right to deduct in 1920 depreciation in the sum of $30,000, representing ten-twelfths of the $36,000. In denying the taxpayer's claim, we said:

This necessarily involves the proposition that at the end of such period the subscription list purchased by it had no value. We can not agree that this is so, nor can we agree that what the taxpayer purchased was 9,000 contracts expiring within 12 months. *It purchased an asset which was a subscription list subject to fluctuations from time to time.* [Emphasis supplied.]

The situation in *Danville* is much the same as the situation here. In *Danville* the taxpayer acquired 9,000 subscriptions which expired in

'but you can't prove it in any way because the books are in very bad shape.' He said 'I agree, but I still think I am entitled to some.'

"So in the negotiations it worked out that we in effect said well, if there is any income left we will participate and repay that to you in the form of an amount equal to a percentage of the profits.

"I thought I had made a reasonably good deal because if we didn't have the income, which would be taxable income, we wouldn't have the expense.

"So that was the premises upon which this negotiation was made, of paying a percentage of the profits."

from 1 to 12 months. At the expiration date some subscribers would renew and some would not. In the instant case petitioner, through its assignor, acquired 3,330 lessees. At the expiration date some of the lessees would and did renew their leases. The taxpayer in both cases acquired a going business with existing subscribers and existing lessees, and did not have to start from the beginning as a new business would have to do. Petitioner already had lessees and hoped to continue dealing with the profitable ones, which it in fact did. In this connection, Grimes, on cross-examination, testified as follows:

Q. Now the leases that you acquired from Greyhound in effect gave you a list of companies that were interested in the type of service that you intended to use in the future, is that correct?
A. Yes, sir.
Q. And you did in effect get renewals of leases, of companies that you had acquired from Greyhound?
A. Well, I think the word renewal was in order, yes.
Q. In fact, isn't it true that some of the customers or leases originally obtained from Greyhound are still using the service that is offered by the Commercial Credit?
A. Yes, that is true. By Commercial Credit Industrial.
Q. Industrial Corporation, that's right. Now when you acquired the leases originally did you expect to retain or at least hope to retain a large percentage of the customers of Greyhound?
A. I will have to put a modification on that—only where they were profitable yes. The profitable ones we intended to retain, right.
Q. Now by acquiring the going or operating business of Greyhound, Commercial Credit Industrial Corporation was able to commence the fleet leasing business immediately, is that correct?
A. Yes.

In *U.S. Industrial Alcohol Co.*, *supra*, the taxpayer acquired a going business which included approximately 200 sales contracts for the delivery of alcohol over the succeeding year and sought to amortize the cost of the contracts, which we denied and were affirmed. In *Thrifticheck Service Corp.*, *supra*, the taxpayer acquired a going check-servicing business which included 200 customer servicing contracts which it sought to amortize and which we denied and were affirmed. In *Westinghouse Broadcasting Co.*, *supra* (issue 2), the taxpayer purchased an operating television station which included 183 spot advertising contracts that would expire within 1 year and sought to amortize the cost of such contracts. In holding against the taxpayer, we said:

These contracts were not purchased as individual contracts. In fact, the letter purchase agreement did not specify the price for each contract nor even the total basis assigned to them. Petitioner purchased a mass asset whose value will fluctuate as contracts expire and as new contracts are signed. When confronted with this issue, this Court has consistently held such a mass asset not depreciable because it did not have a determinable useful life * * *

In support of this holding, among the cases we cited were *The Danville Press, Inc.; U.S. Industrial Alcohol Co.; Thrifticheck Service Corp.;* and *Richard M. Boe,* all *supra.*

In its brief petitioner cites *Seaboard Finance Co.,* T.C. Memo. 1964–253, as persuasive support for its position. That case has since been affirmed by the Ninth Circuit. See *Commissioner* v. *Seaboard Finance Co.,* 376 F. 2d 646 (C.A. 9, 1966). In that case the taxpayer purchased approximately 55 small loan businesses at a premium. The question presented was whether the premiums were paid for the loan accounts or for goodwill. The Commissioner determined that the entire premiums were paid for goodwill or other elements of value which were not depreciable under the indivisible asset rule. We held, applying the principle of *Cohan* v. *Commissioner,* 39 F. 2d 540 (C.A. 2, 1930), that 30 percent of the premiums paid was allocable to goodwill, since certain factors indicated that some part of the cost of the premiums was paid for going-concern value; and that 70 percent of the premiums paid was for the loan contracts and was subject to amortization. In affirming our holding that the indivisible asset rule was not applicable to 70 percent of the premiums, the Ninth Circuit said:

In this case, Seaboard apparently made an honest attempt to value the premium paid, under the impression that a depreciation deduction would be allowed. Each contract was individually analyzed to determine its ultimate worth. Although part of the premium was correctly held by the Tax Court to be good will, it does not appear that the remaining portion of the premium should be declared non-depreciable on the basis of the "indivisible asset" rule.

One of the reasons given by the Tax Court for rejecting this alternative argument, was that the "indivisible asset" rule is inapplicable where the purchase price was derived by appraising the value of each individual asset. The Tax Court cited Boe v. Commissioner, 9 Cir., 307 F. 2d 339 [10 AFTR 2d 5458], for this proposition.

In Boe, the taxpayer was unable to value each of the individual medical contracts which were there purchased, and as a result no part of the total purchase price was assigned to any contract or group of contracts. There was simply bargaining between the parties as to what would be paid for the business as a whole. Under these circumstances the Tax Court, and this court, applied the "indivisible asset" rule, and therefore held that it was not shown that the capital asset involved—the contract medical business—diminished in value each time there was termination of a particular contract. See Boe, supra, at 343.

In the instant case, there was no attempt made at any time to place a value on each of the leases. The record shows that petitioner merely acquired all the leases in a bulk transaction and that the agreement of sale and the amendments thereto did not specify the price for each lease or even the total price assigned to them. Furthermore, no evidence was presented to show that petitioner attempted to value each

lease, or that it inspected each lease prior to its acquisition. There is present here no basis for the application of the *Cohan* rule.

We hold for the respondent on the basis of our ultimate finding and the cases above cited. Cf. *Commissioner* v. *Indiana Broadcasting Corp.*, 350 F. 2d 580 (C.A. 7, 1965), reversing 41 T.C. 793. It thus becomes unnecessary for us to consider the respondent's third ground for the disallowance of the deductions claimed, namely, "that the $260,257.96 represented, in part, additional purchase price of R. A. Auto Leasing, Ltd. stock."

*Decision will be entered for the respondent.*