Xavier Aphessetche and Marie T. Aphessetche v. Commissioner.
Aphessetche v. Commissioner
Docket No. 4424-66.
United States Tax Court
T.C. Memo 1968-191; 1968 Tax Ct. Memo LEXIS 109; 27 T.C.M. (CCH) 929; T.C.M. (RIA) 68191; August 29, 1968. Filed George R. Phillips, 608 S. Hill, Los Anegles, Calif., for the petitioners. Martin R. Simon, for the respondent. SCOTT Memorandum Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes for the calendar years 1963 and 1964 in the amounts of $1,104.34 and $1,327.79, respectively. One of the issues raised by the pleadings has been disposed of by agreement of the parties, leaving for our decision whether petitioners are entitled to deductions for amortization or depreciation of their cost of an intangible asset arising from agreements for purchase by distributors of specified amounts of their milk production at the California Class I price. All of the facts have been stipulated and are found accordingly. *110 Petitioners, husband and wife who resided in Artesia, California at the date of the filing of the petition in this case, filed joint Federal income tax returns for the calendar years 1963 and 1964 with the district director of internal revenue at Los Angeles, California. Meadowview Farms, Inc. (hereinafter referred to as Meadowview), a California corporation, purchased certain equipment and dairy cattle from Van Ruiten Dairy and immediately thereafter sold those assets to petitioners for $100,350, which sum included $56,100 for "intangible assets." Petitioners as purchasers and Meadowview as seller entered into an agreement dated December 15, 1961, which provided that the purchasers make a deposit of $10,000 as part payment on account of the purchase price of personal property located at 11963 Del Amo Boulevard in Artesia, Los Angeles, County, California, owned by the seller, composed of 160 dairy cows, 2 Holstein breeding bulls, and certain specified dairy equipment. This agreement further provided that an additional amount of $15,000 would be paid by the purchasers into escrow before the purchasers received possession of the property and that on or about the date of possession *111 the purchasers were to pay an additional $35,000 to be obtained from the proceeds of a note to be secured by a first mortgage on 140 dairy cows, and 2 breeding bulls, and the milk production equipment which the purchasers were to purchase from the seller, and that the remaining $40,350 would be evidenced by a note in favor of the sellers to be secured by a second mortgage on the same personal property, the note to be payable $3,350 on or before the 31st day of January 1962, $4,250, or more, on the 20th day of February 1968, $6,600, or more, on the 20th day of February 1969, $7,600, or more, on the 20th day of February 1970, $8,700, or more, on the 20th day of February 1971, and the entire remaining balance on January 15, 1972. The note was to bear 6 1/2 percent interest on the unpaid balance. This agreement provided for the purchasers to buy from the seller certain hay and grain located on the premises at the date of sale and contained the following further provisions: This transaction is being made subject to the Purchasers receiving a Dairy Lease on the dairy premises located at 11963 Del Amo Boulevard, Artesia, California, for an initial term of five (5) years, commencing on the *112 15th day of January, 1962, at noon, and ending on the 15th day of January, 1967, at noon, at a monthly rental of $550.00, payable monthly in advance, said Dairy Lease to be drawn and signed by the Lessees and Lessors on or before the 23rd day of December, 1961 [later extended to January 15, 1962] * * * It is hereby understood and agreed by and between the Purchasers and the Meadow View Farms, Inc. that said parties shall enter into a Producer-Distributor Agreement for Purchase and Sale of Fluid Milk (hereinafter referred to as milk contract) for a period of ten (10) years commencing on the 16th day of January, 1962, giving to the Purchasers and/or Producer the right to produce and sell to Madow View Farms, Inc. 178 lbs. 930 of fluid milk fat daily during the period from September 16th through June 15th, and 150 lbs. of fluid milk fat daily during the period from June 16th through September 15th of each and every year throughout said 10-year period. It is hereby understood and agreed by and between the Purchasers and Meadow View Farms, Inc. that said milk contract, which shall be dated December 23, 1961, [later changed to January 13, 1962] may be canceled by Meadow View Farms, *113 Inc. at any time after April 15, 1967, after sixty (60) days' notice in writing by Meadow View Farms, Inc. to the purchasers herein named. If, at any time throughout the term of said milk contract, Meadow View Farms, Inc. decides to exercise this option to cancel said milk contract, then and in that case the Purchasers herein named shall have the right to cancel the Dairy Lease hereinbefore described, effective concurrently with the cancellation of said milk contract; and further it is hereby understood and agreed that the note in the amount of $40,350.00, or any renewals or extensions thereof, in favor of Meadow View Farms, Inc., a California corporation, or order, secured by a second mortgage of chattels and crops, shall be reduced by the sum of Four Hundred Sixty-Seven and 50/100 dollars ($467.50) plus [sic] the number of months remaining between the effective date of said cancellation and January 15, 1972, plus six and one-half (6 1/2) per cent interest on the total of said amount of money from January 15, 1962, to the effective date of said cancellation, unless Meadow View Farms, Inc. obtains a noncancellable milk contract at least of comparable value for the Purchasers from *114 another financially responsible processor and/or milk distributor throughout the remaining period of said milk contract. It is hereby further understood and agreed that Mr. Henry Van Ruiten, secretary of Meadow View Farms, Inc., a California corporation, hereby guarantees good performance of the terms and conditions of said milk contract. * * * The agreement as modified was carried out by the parties, and on or about January 15, 1962, petitioners and Meadowview by Thomas Van Ruiten, its president, and Henry Van Ruiten, its secretary, entered into an agreement of indebtedness whereby petitioners agreed to pay to Meadowview the $40,350 in accordance with the prior agreement. On January 13, 1962, the Van Ruiten Dairy, a partnership composed of Henry G. Van Ruiten, Mary Van Ruiten, Jake Van Ruiten, and Jacoba Van Ruiten, agreed to sell and petitioners agreed to purchase all the hay and grain located at 11963 Del Amo Boulevard, Artesia, California, at 11:00 a. m. on the 15th day of January 1962. On January 15, 1962, petitioners executed a promissory note payable to Meadowview in the amount of $40,350, payments to be made in accordance with the schedule of payments and conditions previously *115 agreed to, and petitioners and Meadowview executed a "Producer-Distributor Agreement for Purchase and Sale of Fluid Milk" whereby the distributor agreed to purchase from the producer, and the producer agreed to sell to the distributor an amount of 178 pounds of fluid milk fat daily from the producer's herd during the period from September 16 through June 15 of each and every year throughout the term of the agreement, and 150 pounds of fluid milk fat daily during the period from June 16 through September 15 of each and every year throughout the term of the agreement, being Grade A market milk as defined in the Agricultural Code of the State of California. This agreement specified the various classes of milk and provided that the 178 pounds of fluid milk fat daily and the 150 pounds of fluid milk fat daily should be paid for at the Class I price for fluid milk as established in the Stabilization and Marketing Plan for fluid milk in the area in which such fluid milk is ultimately sold. It also provided for disposition of milk in excess of the amounts specified in the agreement, for handling, hauling, and inspection of such milk, and contained the following provisions: This agreement *116 may be assigned by the Distributor without the written consent of the Producer, but if assigned the new distributor must be able to furnish a $5,000.00 milk bond without endorsement, in accordance with the rules and regulations of the Department of Agriculture, Bureau of Milk Stabilization. This agreement may also be assigned by the Producer without the written consent of the Distributor to any party or parties who are financially responsible, of good character, and having a reputation for good quality milk production, and actually operate the dairy herd and reside on the dairy premises. * * * In the event the Producer should default in the terms and conditions of a note dated January 15, 1962, in the amount of $40,350.00, secured by a second mortgage of chattels and crops, or any renewals or extensions thereof, by and between [petitioners], as mortgagors, and the Distributor herein named as mortgagee, and demand is made on the Producer for immediate 931 payment of said note or notes and/or the mortgage of chattels and crops securing same and the Producer and/or mortgagors should default upon 15 days' notice in writing to pay same or to correct such default, and said default *117 has not been corrected within said 15-day period, then and in that case this Agreement shall become null and void and of no further force and effect, at the option of the Distributor, except with respect to the obligations of the parties which have not been performed and the rights of the parties which have accrued prior to such cancellation. In the event that the Producer and/or the lessors should violate or default in the terms and conditions of a Dairy Lease dated Jan. 15th, 1962. by and between Jake Van Ruiten and Jacoba Van Ruiten, husband and wife, and Henry G. Van Ruiten and Mary Van Ruiten, husband and wife, as Lessors, and [petitioners], as Lessees, and said Dairy Lease should therefore become null and void after a thirty-day notice in writing to correct such default and said default has not been corrected within said thirty-day period, then and in that case this Producer-Distributor Agreement for Purchase and Sale of Fluid Milk shall likewise become null and void, coincident with any cancellation of said Dairy Lease, at the option of the party not in violation, except with respect to the obligations of the parties which havi not been performed and the reghts of the parties *118 which have accrued prior to the date of such cancellation. * * * This Agreement shall commence as of the 16th day of january, 1962, and end on the 15th day of January, 1972, being the initial term of this Agreement. This Agreement shall continue in full force and effect and be automatically renewed from month to month unless sooner terminated as herein provided. Producer shall have the right to cancel and terminate this Agreement and Distributor shall have the right to cancel and terminate this Agreement at the end of said initial term by serving upon the other party a written notice of their desire to do so thirty (30) days prior to the termination date of this Agreement. In such event this Agreement shall be cancelled and of no further force and effect except with respect to the obligations of the parties which have not been performed and the rights of the parties which have accrued prior to the date of such cancellation. The Distributor is hereby given the right to cancel this Agreement in its entirety at any time after April 15, 1967, after having given sixty (60) days' notice in writing to the Producer, except with respect to the obligations of the parties which have not *119 been performed and the rights of the parties which have accrued prior to the date of such cancellation. The "Producer-Distributor Agreement for Purchase and Sale of Fluid Milk" has below the signatures of Meadowview Farms, Inc. by Thomas Van Ruiten, President, and Henry Van Ruiten, Secretary, and each of petitioners as producers, the following guarantee: The undersigned hereby convenant and agree to guarantee good performance by the Distributor, Meadowview Farms, Inc., of the terms and conditions as set forth in this Producer-Distributor Agreement for Purchase and Sale of Fluid Milk. In witness whereof the parties hereto have set their hands and seals this 15th day of January, 1962. /s/ Henry G.Van Ruiten Henry G. Van Ruiten /s/ Mary Van Ruiten Mary Van Ruiten At the time petitioners and Meadowview negotiated and entered into the producer-distributor agreement and other agreements with respect to the purchase and sale of personal property consisting of the diary herd and milk producing equipment, Meadowview was in a precarious financial condition although its shareholders were substantial individuals financially. The production and sale of milk is a regulated industry *120 in the State of California under the Agricultural Code of the state. A producer in order to make a profit, must be able to obtain a contract to sell at least a certain quantity of his milk at the Class I price set under the California law. Petitioners as producers and the other parties to the transaction between petitioners and Meadowview bargained for and intended that petitioners as producers be guaranteed a right to sell a certain quantity of their milk at the Class I price. In April 1964 prior to the time when petitioners had recovered by way of the favorable Class I price all of the amount paid upon the intangible right, Meadowview became unable to perform under its contract due to its dire financial condition. On April 11, 1964, an agreement was entered into between Meadowview and petitioners and Jake Van Ruiten, Jacoba Van Ruiten, Henry G. Van Ruiten, and Mary Van Ruiten, which recited that on or about January 15, 1962, Meadowview and petitioners had entered into a Producer-Distributor Agreement for the purchase and sale of fluid milk, which was guaranteed by Henry G. Van Ruiten and Mary Van Ruiten, that on or about the 932 15th day of January petitioners had executed *121 and delivered to Meadowview a promissory note for $40,350 secured by a chattel mortgage, that likewise on or about January 15, 1962, Van Ruiten, as lessor, and petitioners, as lessee, had entered into and executed a dairy lease of real property located at 11963 Del Amo Boulevard, Artesia, California, that by reason of the inability of Meadowview to perform the terms of its agreement it had become necessary to cancel, amend, and change the various mentioned agreements, and that it was the desire of all parties to accomplish such cancellation, amendment, and change by execution of the following agreement. The following agreements provided for the cancellation as of the close of business, Friday, April 17, 1964, of the ProducerDistributor agreement between Meadowview and petitioners, that such cancellation would release Van Ruiten from his covenant guaranteeing the performance by Meadowview of such agreement, that the dairy lease between Van Ruiten and petitioners is amended to provide that petitioners shall have the privilege of terminating the dairy lease by giving to Van Ruiten 60 days' notice, that the principal sum ($40,350) of the promissory note dated January 15, 1962, shall be *122 reduced by $10,000, that petitioners were to receive from Carnation a contract under and by the terms of which petitioners would agree to sell to Carnation and Carnation would agree to purchase from petitioners 6,700 pounds of Grade A fluid milk per day, commencing April 18, 1964, the contract to be drawn in the usual and customary form used by Carnation. The agreement further provided that if the contract between Carnation and petitioners were to be terminated through no fault of petitioners at any time prior to January 15, 1972, petitioners * * * shall receive credit on said hereinbefore mentioned promissory note dated January 15, 1962, in the original principal sum of FORTY THOUSAND THREE HUNDRED FIFTY DOLLARS ($40,350.00), of an amount of money equal to FOUR HUNDRED SIXTY-SEVEN and 50/100 DOLLARS ($467.50), multiplied by the number of calendar months, or portion thereof, remaining between the date of termination of said CARNATION contract and January 15, 1972, plus six and one-half per cent (6 1/2%) interest on the amount of money so calculated from January 15, 1962, to said date of termination of the CARNATION contract, less the sum of TEN THOUSAND DOLLARS ($10,000.00). It is *123 intended, however, that the credit to be received by [petitioners], as hereinbefore set forth, shall not, in any event exceed the total unpaid balance of said promissory note, plus the interest thereon, as provided in said promissory note. It was further provided that all of the agreements made were conditioned upon the execution of the contract between Carnation and petitioners. On April 18, 1964, petitioners and Carnation entered into a contract entitled, "Producer Agreement Form No. AP 64," which was the standard form of purchase and sale of milk contract used by Carnation. This contract provided: 1. Producer shall sell, and distributor shall purchase for its processing plant located at Los Angeles a monthly quantity of milk meeting the requirements * * * [specified] determined by multiplying 5,025 pounds of milk containing 180 pounds of milk fat and 430 pounds of milk solid nonfat by the number of days in the applicable month, hereinafter called "contract quantity". * * * It contained certain provisions with respect to milk in excess of the specified quantities or permissible reduction in quantities in the event the producer did not produce for a particular period specified *124 quantities. The contract also contained the following provision with respect to the quantity of milk to be sold by the producer and purchased by Carnation: (D) In the event producer's actual deliveries of milk in any month are less than his contract quantity for such month, then the contract quantity shall be his shipments. Distributor may from time to time reduce the conract quantity at the beginning of any month by giving written notice of such reduction not less than five (5) days prior to the beginning of such month. Provided that such reduction shall not be more than ten (10) percentage points lower than the contract quantity in effect during the previous month nor more than twenty-five (25) percentage points lower than the contract quantity in effect during the previous year. The contract contained the following provisions with respect to its term: 13. This agreement shall be effective on April 18, 1964, and shall continue until April 1, 1965, and for successive terms of one (1) year each thereafter, provided, however, that either party may terminate this agreement on the expiration date of the original term or the expiration date of any subsequent term by giving written *125 notice to the other party at least fifteen (15) days prior to the applicable expiration date. 933 The final provision of this contract stated: 15. This agreement constitutes the entire agreement between the parties with respect to the sale by producer to distributor of milk produced by producer, and supersedes any and all previous agreements with respect thereto, oral or written, entered into between the parties. The promissory note in the original sum of $40,350 which petitioners had given to Meadowview was amended to reduce the principal sum to $27,000 in accordance with the agreement of the parties to reduce the unpaid balance on the note by $10,000. The agreement to reduce the balance due on the note contained the following provision: in the event that certain contract dated April 18, 1964, by and between CARNATION and [petitioners] shall be terminated through no fault of [petitioners] at any time prior to January 15, 1972, [petitioners] shall, coincidentally with said termination, receive a further credit against the unpaid balance of said promissory note of an amount of money equal to FOUR HUNDRED SIXTY-SEVEN and 50/100 DOLLARS ($467.50), multiplied by the number *126 of calendar months, or a portion thereof remaining, between the date of termination of said contract and January 15, 1972, plus interest at the rate of six and one-half per cent (6 1/2%), per annum, on the amount of money so calculated from January 15, 1962, to the date of termination of said contract, less the sum of TEN THOUSAND DOLLARS ($10,000.00). In no event, however, shall the credit so calculated exceed the total unpaid balance of said promissory note, pluss [sic] the interest thereon, as in said promissory note provided. Petitioners on their joint Federal income tax return filed for the calendar year 1963 claimed a depreciation deduction on a "milk contract" with a basis of $56,100 of $5,610, showing the contract to have a useful life of 10 years and the method of depreciation used to be straight line. Petitioners showed depreciation previously claimed for the period January 15, 1962 through the balance of the year 1962 to be $5,376.25. Petitioners on their joint Federal income tax return for the calendar year 1964 claimed a depreciation deduction on a "milk contract" with a basis of $56,100 of $4,696.02, showing the contract to have a useful life of 10 years, the method *127 of depreciation used to be straight line, and the date the contract was acquired as January 15, 1962. Respondent in his notice of deficiency disallowed the claimed deduction for depreciation in each of the years 1963 and 1964 on the "intangible asset (milk contract)" on the ground that petitioners had failed "to show that the contract is of a type subject to the depreciation allowance." Petitioners take the position that the intangible rights they acquired from Meadowview to sell a stated amount of milk at the Class I price over a period of 10 years is a capital asset with a useful life of 10 years. Petitioners state that even though their contract with Meadowview contained a provision for its continuation on a month-to-month basis at the end of its 10-year term unless one of the parties thereto notified the other party by serving a 30-day written notice of his desire to terminate the agreement at the end of the initial period, that the actual life of the intangible right to sell the milk was 10 years. Petitioners equate the provision for continuation unless one party chose to terminate, with agreements contained in various types of contracts to renew beyond the specified life *128 of the contract by negotiation. Petitioners state that the intangible asset they obtained in connection with the January 1962 Meadowview transaction did not expire when the original Meadowview contract was cancelled by agreement in April 1964 and a 1-year contract was entered into between petitioners and Carnation which would be renewed automatically for terms of one year unless one party to the contract gave written notice of termination to the other party 15 days prior to the expiration date of the contract. Petitioners contend that the other provisions of the agreement between Meadowview and petitioners and the provisions contained in the agreement April 11, 1964, between petitioners and Meadowview and the Van Ruitens must be read in connection with the contract between petitioners and Carnation. Petitioners state that when the provisions of these various agreements are considered together, they show that their intangible right to sell a stated amount of milk at the Class I price for a period of 10 years continued in a modified form after the cancellation of the Meadowview contract. Petitioners explained the $10,000 reduction in the price of the "intangible" which they acquired *129 from Meadowview and the Van Ruitens who guaranteed the Meadowview contract as resulting from the provision in the Carnation contract that the "distributor may from time to time reduce the contract quantity at the beginning of any month by giving written notice of such reduction not less than five (5) days prior to the beginning of such month, provided that such reduction shall not be more than 934 ten (10) percentage points lower than the contract quantity in effect during the previous month nor more than twenty-five (25) percentage points lower than the contract quantity in effect during the previous year." They point out that the Meadowview contract was absolute for a daily amount of 178 pounds of fluid milk fat for a certain part of the year and 150 pounds of fluid milk fat for the remainder of the year to be purchased at the Class I price whereas the Carnation contract allowed the purchaser to elect to take reduced amounts. Since petitioners take the view that the intangible right to sell a specific quantity of milk at the Class I price provided under California law was the intangible asset which they acquired in 1962 in connection with the Meadowview transaction and that *130 the specific Meadowview contract was merely a part of the overall method of acquiring this intangible right, they contend that this intangible right continued upon the cancellation of the Meadowview contract and the execution of the contract between petitioners and Carnation. They point out that Meadowview had the right to assign its contract but that since Carnation required that its own form of contract be used, the agreement of April 11, 1964, between petitioners and Meadowview and the Van Ruitens was necessary to substitute Carnation as the purchaser of petitioners' milk over the remaining portion of the 10-year period from April 1964, but that this method of substitution of the purchaser of the milk did not remove the guarantee by Meadowview and the Van Ruitens that petitioners would continue to have the right to sell the specific quantity of milk at the Class I price if petitioners were to be required to pay Meadowview for the intangible right to sell milk over the 10-year period which it had purchased from Meadowview in January 1962. Viewing the contract of April 18, 1964, as in substance a substitution of the purchaser of petitioners' milk with Meadowview continuing with *131 its agreement as to the price reduction if petitioners' right to sell a specified quantity of milk at the Class I price ceased, petitioners contend that under the holding in Birmingham News Company v. Patterson, 224 F. Supp. 670 (N.D. Ala., 1963), affirmed per curiam 345 F. 2d 531 (C.A. 5, 1965), and Bonwit Teller & Co. v. Commissioner, 53 F. 2d 381 (C.A. 2, 1931), reversing 17 B.T.A. 1019 (1929), which reversal was accepted by this Court in Pittsburgh Athletic Co., 27 B.T.A. 1074 (1933), affirmed 72 F. 2d 883 (C.A. 3, 1934), the cost of their "intangible asset" (the right to sell a specified quantity of milk at the Class I price) is properly amortizable over a 10-year period. In Birmingham News Conpany v. Patterson, supra, the Court held a contract for a term of 30 years, automatically renewable for succeeding periods of 10 years unless either party notified the other party at least 2 years before the end of the initial 30-year period or before the end of the then current renewed period, of the desire of the party giving such notice to terminate the agreement, to be subject to amortization over a *132 30-year useful life. In its opinion the Court relied on Bonwit Teller & Co. v. Commissioner, supra, stating that a renewal which will occur only if neither party to the contract gives notice of his desire to terminate is not distinguishable from a right in one party to negotiate a renewal with respect to a lease at the end of the initial period. The Court in Birmingham News Company v. Patterson, supra, at 675, stated: Automatic Heating & Cooling Co. v. Commissioner, decided October 20, 1942 (1942 B.T.A. and T.C. Memorandum Decisions, par. 42,561), involved a renewal provision similar to that in the Agency Contract. In 1937 the taxpayer was granted an exclusive franchise for 10- 1/2 years to be "* * * automatically extended from 1947 [its original termination date], from year to year, provided, however, that either party may, by written notice to the other party, delivered on or before December 31st of any year beginning with the year 1947, terminate this agreement, such termination to take effect on June 30th of the next succeeding year." The Commissioner contended that this clause rendered the duration of the contract indefinite. In holding otherwise, *133 the Board of Tax Appeals wrote: "This provision, we believe, is analogous to a renewal option to extend a lease beyond 'the period over which exhaustion of the leasehold is to be spread [where] the renewal privilege had not been exercised and may never be.' Bonwit Teller & Co. v. Commissioner, 53 F. 2d 381, certiorari denied 384 U.S. 690. Under such circumstances depreciation is to be allowed during the period covered by the lease, the exercise of the option creating a new term. (citing cases) * * * The contract 'grants, * * * for the 935 period ending December 31, 1947, an exclusive franchise * * *' Thereafter, it may be terminated by Automatic. Petitioner has no assurance it will not be terminated at that time. The provision, therefore, gives petitioner no more assurance it will have a franchise after December 31, 1947, then would one giving it an option to renew if Automatic should see fit to grant a franchise to anyone." Respondent recognizes that under the provisions of section 167(a), I.R.C. 1954, and Section 1.167(a)-3, Income Tax Regs. *134 , [1] petitioners are entitled to deductions for depreciation of the "intangible" assets which the parties stipulated petitioners acquired in connection with the Meadowview transaction at a price of $56,100, if they can show that the "intangible" asset had a limited useful life which may be estimated with reasonable accuracy. Respondent argues that the Birmingham News Company and Bonwit Teller & Co. cases are distinguishable from the instant case since the contracts involved in those cases provided for "renegotiation" at the end of their initial terms. Respondent states that the contract in the Bonwit Teller & Co. case specifically provided for renegotiation and that the 2-year notice of intention to terminate required in Birmingham News Company in substance was a provision for renegotiation. Respondent then states that since the Class I price for milk was fixed by law in California, there would be nothing to renegotiate between petitioners and Meadowview and that this position is confirmed by the 30-day notice period of intention to terminate provided for in the contract. *135 Respondent overlooks the fact that of prime importance was the quantity of milk petitioners might sell at the Class I price and that this clearly might be subject to renegotiation but might require only a 30day period of negotiation as compared to a longer period where there were more aspects to be renegotiated. We do not agree with respondent's distinction of the instant case from the Birmingham News Company and Bonwit Teller & Co. cases and therefore conclude that the contract between petitioners and Meadowview did have a reasonably ascertainable useful life of 10 years. Respondent contends that even if the view is taken that the contract between Meadowview and petitioners had a reasonably ascertainable useful life of 10 years, this contract was cancelled in April 1964 and the contract which was entered into between petitioners and Carnation in April 1964 was separate and distinct and not a part of the Meadowview contract. Respondent argues that the Carnation contract had an indefinite useful life since it was automatically renewable from year to year. Respondent relies in this connection on Dallas Athletic Association, 8 B.T.A. 1038 (1927); Indiana Broadcasting Corporation v. Commissioner, 350 F. 2d 580 *136 (C.A. 7, 1965), reversing 41 T.C. 793 (1964); Nachman v. Commissioner, 191 F. 2d 934 (C.A. 5, 1951), affirming 12 T.C. 1204 (1949); Thrifticheck Service Corp. v. Commissioner, 287 F. 2d 1 (C.A. 2, 1961), affirming 33 T.C. 1039 (1960); Westinghouse Broadcasting Company v. Commissioner, 309 F. 2d 279 (C.A. 3, 1962), affirming 36 T.C. 912 (1961); Grant T. Rudie, Jr., 49 T.C. 131 (1967); and V. P. Shuffebarger, 24 T.C. 980 (1955). Respondent states that these cases stand for the proposition that a 1-year renewable contract has an indefinite useful life and that the cost to a taxpayer of such a contract may not be recovered by depreciation deductions but must be capitalized as the cost of a nondepreciable asset and recovered when the contract is sold or cancelled. Respondent misinterprets these cases. The case of Dallas Athletic Association [Dec. 3024], 8 B.T.A. 1036 (1927), was specifically overruled by the holding of this Court in Pittsburgh Athletic Co., supra, in which we stated at p. 1077: "The Board has heretofore had occasion *137 to consider contracts of the nature of those in question in the cases of Dallas Athletic Assn., 8 B.T.A. 1036, and Houston Baseball Assn., 24 B.T.A. 69. The provisions of the contracts considered by the Board in those cases are substantially the same as the provisions of the contracts involved in these proceedings. In the Dallas case, supra, the Board said. 936 "'It is well settled that if these contracts represent capital assets and were exhausted by the passage of time or otherwise, the petitioner is entitled to spread the amount paid for each contract over the determinable period of its life and to deduct an aliquot part thereof in each year.' "We held that the renewal clause in the contracts under the conditions presented gave the contract a life of more than one year. In the light of the decision in the case of Bonwit Teller & Co. v. Commissioner 53 Fed. (2d) 381, we think we were in error, and those decisions will not be followed." We concluded in Pittsburgh Athletic Co., supra, that the 1-year contract there involved with an option to renegotiate renewal had a useful life of only one year and the cost of such *138 contract might be deducted in the 1-year period. The other cases cited by respondent involved licenses which as a matter of policy of a governing body were automatically renewed, or television network affiliation contracts which by custom over a long period of time were renewed on an indefinite basis, or purchases of customer contracts which we considered to be in the aggregate in the nature of purchases of goodwill and not the purchase of various contracts of limited life. These cases do not support the proposition that merely because a contract has an initial period of one year with a right of renewal, it follows that such contract does not have a reasonably ascertainable useful life. We agree with respondent that if the Carnation contract is to be viewed separate from and as a different asset from petitioner's agreement with Meadowview, there would be no basis for determining a 10-year useful life for that contract. Petitioners have not shown a reasonably ascertainable useful life for the Carnation contract aside from its relationship to petitioners' agreement with Meadowview and the Van Ruitens. However, we agree with petitioners that the intangible asset which they acquired *139 was a right to sell a specific quantity of milk at the Class I price over a 10-year period and that this intangible asset continued under petitioners' agreement made with Meadowview and the Van Ruitens in April 1964. Petitioners' contract with Carnation was the method whereby petitioners and Meadowview agreed that this right to sell milk over this period should be carried out. The agreement cancelling the Meadowview contract was made specifically dependent upon petitioners' entering into the contract with Carnation and the agreement provided that if petitioners' right to sell a stated quantity of milk over the remaining portion of the 10-year period were cancelled at any time before the end of the 10-year period without substitution of a similar right with some other purchaser there would be a proportionate reduction in the amount petitioners were required to pay to Meadowview. If there had been no relationship between the Carnation contract and petitioners' agreement with Meadowview it would have followed that under the terms of the guarantee of the Van Ruitens of the Meadowview contract up to April 15, 1967, it would have been necessary that the guarantors either pay petitioners *140 the price of the milk or find some other purchasers for petitioners' milk. After April 15, 1967, the price that petitioners were to pay to Meadowview would have been reduced by $467.50 per month for the remaining portion of the initial agreement or to January 15, 1972, if there were no relationship between the rights petitioners obtained from Meadowview and the Carnation contract. The Meadowview contract was cancelled prior to April 15, 1967, only on the conditions that petitioners and Carnation enter into a milk contract and Meadowview agree to the cancellation of the indebtedness representing part of the purchase price of the assets petitioners purchased from Meadowview if during the balance of the 10-year period of the original Meadowview contract petitioners' right to sell a specified quantity of milk at the Class I California price was cancelled. We therefore agree with petitioners that the intangible asset they acquired from Meadowview to sell a certain quantity of milk at the Class I California price for a period of 10 years was still in effect throughout the year 1964 even though petitioners were selling their milk to Carnation under a contract between petitioners and Carnation. *141 It is not the Carnation contract which is subject to amortization. So far as this record shows, petitioners paid nothing for the Carnation contract independently of what they paid to Meadowview for the right to sell over a period of 10 years a given quantity of milk and would have no basis in the Carnation contract to depreciate independent of the cost to them of the "intangible" assets they acquired from Meadowview. However, petitioners did have a remaining basis in the "intangible" asset 937 they acquired from Meadowview of a right to sell a stated quantity of milk at the Class I California price over a period of 10 years. This "intangible" asset had a 10-year useful life to petitioners, and petitioners are entitled to depreciate the asset over the 10-year period. See Pasadena City Lines, Inc., 23 T.C. 34, 38-39 (1954). Respondent apparently does not question the amount of depreciation deducted by petitioners in each year if we agree that their "intangible" asset, consisting of the right to sell a stated quantity of milk at the Class I California price, had a 10-year useful life. We do not, therefore, consider the issue of the proper amount of depreciation to *142 be before us. However, it might be noted that the $10,000 reduction in the price of petitioners' "intangible" asset applied apparently only to the remaining approximately 7 1/2 years of the contract and not to the full 10-year period. We do not pass upon the propriety of petitioners' method of adjusting for the $10,000 reduction in price since the issue is not here raised. See, however, Cleveland Railway Co., 36 B.T.A. 208, 211 (1937), discussing a proper method of computing amortization where a franchise has been extended or renewed prior to its original expiration date. Decision will be entered under Rule 50. Footnotes
1. Sec. 1.167(a)-3 Intangibles. If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to good will. * * *↩