**HAMPTON PONTIAC, INC., Plaintiff,**

**v.**

**The UNITED STATES of America, Defendant.**

**Civ. A. No. 67–871.**

United States District Court
D. South Carolina,
Columbia Division.

Jan. 8, 1969.

John C. Bruton, Kirkman Finlay, Jr., Boyd, Bruton, Knowlton & Tate, Columbia, S. C., for plaintiff.

Mitchell Rogovin, Asst. Atty. Gen., Tax Division, Myron C. Baum, Chief, Refund Trial Section No. 2., Washington, D. C., Klyde Robinson, U. S. Atty., Columbia, S. C., for defendant.

FINDINGS OF FACT, CONCLUSIONS OF LAW and OPINION

DONALD RUSSELL, District Judge.

This suit to recover federal income taxes allegedly assessed and collected illegally was tried before me, without a jury, upon the pleadings, stipulations of facts, depositions and oral testimony of witnesses. Upon consideration thereof, the Court makes the following findings of fact and conclusions of law:

The plaintiff corporation, of which Sam W. Jones, Sr. is the controlling stockholder and manager, has long been engaged in the distribution of automobiles in Columbia, South Carolina. For a number of years prior to the transaction giving rise to this controversy, it was, by virtue of a franchise granted by Chrysler Motors, Inc., the Dodge dealer in Columbia. Initially, its franchise covered the distribution of Plymouth and Dodge automobiles, both being Chrysler products. In 1959, however, Chrysler discontinued the right of the plaintiff to distribute Plymouths, thus restricting its franchised distributorship to Dodge cars. As a result, the plaintiff's operations were considerably reduced and its business became unprofitable. It concluded that it could only restore its business to profitability by securing another distributorship. With this in view, it sought of the Pontiac Division of General Motors the Pontiac agency in Columbia.

Pontiac advised plaintiff it would not consider plaintiff's application for a franchise in Columbia so long as the existing Columbia franchise of King Pontiac, Inc., which had three more years to run, was outstanding. The owners of King Pontiac, Inc. were F. B. Davis and W. R. Matthews. Mr. Davis, who had been intimately associated in the past with General Motors, was in bad health and took little interest in the affairs of King Pontiac, Inc., leaving the management of such company to W. R. Matthews.

It was plain to the plaintiff from this conversation with the Pontiac management that an immediate Pontiac franchise in Columbia could only be secured by inducing King Pontiac to surrender voluntarily its existing Pontiac franchise. As stated, Matthews was in complete control of the management of King Pontiac. Plaintiff accordingly got in touch with Matthews in an effort to negotiate such surrender. Whether such

approach had been suggested by Pontiac is not clear but seems fairly inferable from the conduct of the parties. At any rate, the plaintiff and Sam W. Jones entered into the contract with King Pontiac and W. R. Matthews, which has generated this controversy. By this agreement, King Pontiac and Matthews bound themselves "to procure the termination of the existing franchise" of King Pontiac and "to procure and accomplish the granting of a new franchise to Sam W. Jones." Contingent on securing such Pontiac franchise, the plaintiff and Sam W. Jones, in turn, agreed to pay over a period of three years to King Pontiac the sum of $15,000, and to Matthews personally for five years a percentage of its profits before taxes.

With the surrender by King Pontiac of its franchise, the plaintiff was promptly awarded the Pontiac franchise in Columbia. By mutual consent, it was renewable indefinitely. The record shows that, at the termination of the initial franchise, it was renewed by the parties for another term. This seems to have been the normal pattern for General Motors dealership, as is hereafter noted. The franchise agreement included, also, specific provisions granting General Motors the *right to terminate* immediately the franchise in the event of the death or withdrawal of the dealership's controlling stockholder and/or manager.

After receiving the franchise, plaintiff commenced making the payments provided under the agreement with King Pontiac and Matthews. During 1962, plaintiff paid Matthews, pursuant to the agreement, $8,040.89. This sum it deducted as salary expense on its federal tax return for that year. Such deduction was disallowed. After making the tax payment required by the disallowed deduction, plaintiff filed this action for refund, contending that the payments made are deductible as ordinary and necessary business expense or, in the alternative, are amortizable over the life of its franchise. The defendant denies that plaintiff is entitled to a deduction on either basis. The issues thus posed by this action are:

(1) Were the payments "ordinary and necessary business expenses"?

(2) If not, and if they represented capital investments, are they amortizable under Section 167 of the Internal Revenue Code (Sec. 167, 26 U.S.C.)?

█ The payments to Matthews were capital investments, not deductible as "ordinary and necessary business expenses". Plaintiff's agreement with Matthews, under which the payments were made, was executed by the plaintiff because plaintiff believed, based on information secured by it from Pontiac, that an agreement for the voluntary cancellation of King's franchise was an essential preliminary step to the award to it of the Pontiac franchise. Matthews, in turn, would only have agreed to the cancellation, payment for which to him and King Pontiac was contingent on plaintiff's securing a franchise, because he had some assurance that, upon the filing of the cancellation, Pontiac would award the new franchise to plaintiff. That the assurance of the plaintiff and Matthews was not ill-founded was proved by the issuance to plaintiff of a franchise promptly after the execution of the agreement between plaintiff and Matthews. In making its agreement with King Pontiac and Matthews, in seeking the voluntary cancellation of this franchise and in enlisting their assistance in procuring a franchise for itself, plaintiff was unquestionably prompted by the reasonable expectation of acquiring thereby the Columbia franchise. That all payments under the agreement were only to be made if and after the plaintiff acquired the franchise demonstrates indisputably that the payments were directly related to the acquisition of the franchise. The contract with Matthews, and the obligations thereby undertaken by the plaintiff, were thus an integral part of plaintiff's expense in acquiring its Pontiac franchise. Payments made thereunder represent accordingly items includible in plaintiff's invested capital and are not

deductible as business expense. See, Richmond Television Corporation v. United States (4th Cir.1965) 354 F.2d 410; Gant v. C.I.R. (6th Cir.1959) 263 F.2d 558; Nachman v. Commissioner (5th Cir.1951) 191 F.2d 934; Times-World Corp. v. United States (D.C.Va. 1966) 251 F.Supp. 43; Tube Bar, Inc. v. Commissioner (1950) 15 B.T.A. 922; McAvoy Company v. Commissioner (1928) 10 B.T.A. 1017.

Though the payments to Matthews should be capitalized, the issue remains whether such payments, so capitalized, may be amortized and, if so, on what basis. Under a Treasury Regulation, first adopted under the Revenue Act of 1918 and remaining substantially unchanged through successive reenactments, thereby acquiring the force of law,[1] intangible assets may only be depreciated if the useful life of the asset is of limited duration, capable from experience of being "estimated with reasonable accuracy." Section 1.167(a)(3), 26 C.F.R.; Richmond Television Corp. v. United States, supra, at pp. 411–2 (354 F.2d); C.I.R. v. Indiana Broadcasting Corporation (7th Cir.1965) 350 F.2d 580, 581; Dodge Bros. v. United States (D.C.Md.1940) 33 F.Supp. 312, 317, aff. 3 Cir., 118 F.2d 95.

It is plaintiff's position that if the payments made as a part of the costs of securing the franchise are to be capitalized, they should be amortizable over the fixed life of the franchise (i.e., five years), the renewal provision of the franchise agreement being too uncertain and speculative to be regarded as giving added duration or import to the franchise.[2] In support of this contention, plaintiff emphasizes that both parties must agree to a renewal and that whether each will so agree depends on the profitability of the franchise from the standpoint of each. Particularly, it offered proof that in the last few years there had been a net reduction, though admittedly small, in the number of franchised automobile dealers in South Carolina and argued from this fact that renewal of franchise was speculative. It relies primarily on Helvering v. Kansas City American Ass'n. Baseball Co. (8th Cir.1935) 75 F.2d 600 and Bonwit Teller & Co. v. Commissioner of Internal Revenue (2nd Cir.1931) 53 F.2d 381, 82 A.L.R. 325, as authority for its position.

The defendant, on the other hand, insists that the experience of General Motors dealerships, as developed in the record herein, shows that the renewal of the franchise, both by the manufacturer and the distributor, is normally routine or automatic and that it is wholly unrealistic to disregard such probability of renewal in arriving at the practical life of the franchise. Under this theory of the defendant, adopted by the Commissioner, the franchise had an indeterminate useful life and accordingly was not depreciable under Regulation 1.167(a)(3). It primarily relies, in support of its contention, upon C.I.R. v. Indiana Broadcasting Corporation (7th Cir.1965) 350 F.2d 580 and Richmond Television Corporation v. United States (4th Cir. 1965) 354 F.2d 410.

The position of the plaintiff is contrary to the weight of the testimony. The record will not permit disregard of the renewal provisions of the franchise. The plaintiff has clearly failed to bear the burden of establishing the amortizable character of his payments on the basis of the fixed life of the franchise. See, Curry v. United States (4th Cir. 1962) 298 F.2d 273, 275. The hearings before the Subcommittee of the Committee on the Judiciary, United States Senate, held in October and November,

1. Richmond Television Corp. v. United States, supra, p. 412, n. 3.

2. Plaintiff did argue initially that the period of amoritzation should be the remaining life of the King Pontiac franchise (i. e., three years). Plaintiff, however, did not acquire such franchise; and the purpose of its agreement and of the payments thereunder was the acquisition of its own franchise, the cost of which should accordingly be the subject of amortization, if such is proper.

1967, and incorporated by agreement of the parties in the record herein (hereafter cited as "Hearings"), established that, certainly in recent years, there had been among General Motors dealerships "relatively few nonrenewals upon expiration of the 5-year term agreements." No doubt this almost automatic renewal of franchise resulted from the demands of the distributors for protection against denial of renewals that culminated in the enactment in 1956 of the "Dealer's Day in Court Act" (Sections 1221–1225, 15 U.S.C.). General Motors has, however, gone beyond the requirements of the Act and given its dealers administrative protection in the exercise of their right of renewal. It provides a right of appeal by any dealer who is denied renewal of his franchise to an impartial "GM dealer relations umpire", who, if he finds the nonrenewal without just cause, may order the franchise renewed; and this decision of the impartial "umpire" is to be accepted as binding by General Motors, though not on the dealer.[3] The present umpire is Honorable Charles Whittaker, formerly a justice of the United States Supreme Court.[4] That these safeguards, given both by statute and by agreement, have given practical meaning to the renewal provision in General Motors' franchises is proven by the record of nonrenewals of such franchises. Thus, with 12,800 dealers,[5] there was not one nonrenewal of franchise in 1964, there were 62 in 1965, 9 in 1966, and only 8 in the first nine months of 1967.[6] More particularly, so far as this record shows, there was not one single instance in which, during the period covered by the franchise involved in this proceeding, a Pontiac Franchise in South Carolina was not renewed by both the manufacturer and the dealer.

The testimony that there had been a small drop in the number of franchised dealerships in South Carolina in the last decade, I regard as largely meaningless. There was no attempt in such testimony to identify and separate the types of franchises involved in the abandoned dealerships. Cf., Westinghouse Broadcasting Company v. C.I.R. (3d Cir.1962) 309 F.2d 279, 283 cert. den. 372 U.S. 935, 83 S.Ct. 881, 9 L.Ed.2d 766. The mortality among dealerships of foreign cars and of those outside the so-called "Big Three", it is well known, is considerably greater than that among the "Big Three" dealerships. Certainly, in view of the actual figures given by the representative of General Motors at the Congressional hearing, it cannot be said that this drop in franchised dealerships in South Carolina occurred among Pontiac dealers.

It is plain from the language of the Court in Richmond Television Corporation v. United States (4th Cir.1965) 354 F.2d 410, 412, that renewal rights are not to be ignored or disregarded in determining the useful life of a contract or franchise under Section 167 but are to be weighed on the basis of the probability of renewal, arrived at in the light of actual "experience". Measured by this standard and giving due weight to the actual record of nonrenewals of General Motors' franchises, it cannot be said that the enjoyment of this franchise "may with reason be expected to end" in five years (354 F.2d 410, 413); on the contrary, the record would indicate quite clearly that the franchise was reasonably certain of renewal indefinitely.

The number of nonrenewals of General Motors franchises, as testified to at the Congressional hearings, is certainly no greater, actually it is likely proportionally less, than the nonrenewals of network affiliation by television stations involved in C.I.R. v. Indiana Broadcasting Corporation (7th Cir.1965) 350 F.2d 580. See, also, the later case of Times-World Corporation v. United States, su-

3. Hearings, pp. 288, 292.

4. Hearings, p. 292.

5. Hearings, p. 286.

6. Hearings, p. 418.

pra, (251 F.Supp. 43, 45–46,) where the Court carefully reviewed the records of the Federal Communications Commission on revocation of radio and television licenses. The number of such revocations, in relation to the number of outstanding radio and television licenses, was proportionately greater than the number of nonrenewals of General Motors franchises. In both cited cases, however, the number of revocations or hearings on revocation was so minimal that the Court found that the renewal rights of the radio or television license holder gave an indeterminate life to the license. By like token, it must be concluded that the renewal right of the plaintiff under its franchise from General Motors gave an indeterminate useful life to such franchise.

Neither Helvering v. Kansas City American Ass'n. Baseball Co. (8th Cir. 1935) 75 F.2d 600, nor Bonwit Teller & Co. v. Commissioner (2d Cir.1931) 53 F.2d 381, 82 A.L.R. 325, on both of which plaintiff relies, is in point. The first involved the personal contract of a professional baseball player. Naturally, such a contract would not be routinely renewed. Its renewal would depend on the salary offered, the past record of the player, the present state of his health, whether the player was traded, and many other factors not typical of other agreements. The second dealt with a renewal option, to be exercised at the end of a twenty-year lease at a rental then to be agreed upon. Again, the renewability of such a lease at such an extended date at a purely speculative rental would not be a routine matter. In this case, on the contrary, as we have seen, the possibility of renewal of franchise is so likely and so near routine, the right of renewal so safeguarded by effective remedies, the record of almost automatic renewal so clearly established, that it would be unrealistic to hold that the useful life of this franchise was limited to five years.

There is, however, one contingency, real and not imaginary, that could terminate this franchise. It is one that would apply both to the original terms of the franchise and to any renewal thereof. It arises out of the very nature of the franchise agreement itself, as spelt out in the agreement. By the express terms of Paragraph "Third", the franchise is "a personal service contract, * * * entered into * * * in reliance upon and in consideration of the personal qualifications of * * * the following named person or persons who, it is agreed, will substantially participate in the ownership * * * and/or will actively participate in the operation of Dealer's Pontiac dealership: Sam W. Jones, Sr." To give force to this specific provision, the franchise states that, "Pontiac may terminate this Agreement immediately * * * in the event of * * * Removal, resignation, withdrawal or elimination from Dealer for any reason of any person named in Paragraph THIRD of this Agreement". The reasons for such provisions in the franchise were explained by the Marketing Vice-President of General Motors, in the Congressional hearings, already referred to, as follows:

> "GM for many years has recognized that the degree to which a dealership will operate successfully in the performance of its functions and responsibilities is directly dependent upon the qualifications, abilities, and personal character of the individual or individuals who actually operate and own the dealership.
>
> "For this reason all car division selling agreements provide that the relationship established by the selling agreement is expressly conditioned upon active participation in the operation, as well as the ownership of the dealership by the individual or individuals specifically named in the selling agreement. This is designed to bring competent management to the dealership operations. * * *
>
> "Essentially, we rely on individuals, persons who we think have the ener-

gy, ability and character to make the association mutually profitable." [7]

That the right of termination given by these provisions is rigorously exercised is manifested by a comparison of the record of involuntary franchise termination and those caused by the death of the participating stockholder and manager under "Paragraph Third". In the Congressional hearing already referred to, it was established that, among GM dealers, 185 franchises were terminated in 1964 under the terms of "Paragraph Third" and only 8 for poor performance, in 1965, 201 were terminated under "Paragraph Third" and 1 for poor performance, and in 1966, 156 were terminated under "Paragraph Third" and not one for poor performance. [8] It seems clear from such record that the death of the participating owner designated in "Paragraph Third" will normally occasion the termination of the franchise. The most that apparently the widow of a deceased participating manager can expect upon such event is "the opportunity to participate financially in the *successor dealership*" (Italics added). [9] The very reference to "successor dealership" is consistent only with the conclusion that the former franchise had been terminated.

Tucker v. Commissioner (8th Cir. 1955) 226 F.2d 177, while involving a Ford franchise, shows that this requirement that the manager of an automobile agency must be its controlling stockholder and that the death or withdrawal of such manager will call for the termination of the franchise is exactingly enforced by automobile manufacturers.

It seems plain, therefore, that the death of Mr. Jones will normally result in the termination of the franchise. Termination, under such circumstance, is not theoretical; it can, with reasonable probability, be expected. When that unfortunate event may occur cannot, of course be predicted with absolute accuracy but, based on experience, the Treasury has established certain mortality tables, which can be utilized in determining when the termination of the franchise on account of Jones' death may reasonably be determined. [10] Such tables can be properly used in calculating the reasonable life of this franchise, as fixed by the terms of "Paragraph Third" of the franchise agreement. After all, calculations of useful life need not be "absolute"; all that is required for their use as a basis for depreciation under Section 167 is that the estimations or approximations be "reasonable" in the light of normal experience. Commonwealth Natural Gas Corp. v. United States (4th Cir.1968) 395 F.2d 493; Northern Natural Gas Co. v. O'Malley (8th Cir.1960) 277 F.2d 128, 135–6; Shell Pipe Line Corp. v. United States (D.C.Tex.1967) 267 F.Supp. 1014, 1021–2. Such tables represent "reasonable" estimations.

## CONCLUSION

To sum up, I am of opinion: (1) that the payments by the taxpayer to Matthews must be capitalized and may not be expensed, (2) that such payments may not be amortized over the initial fixed term of the franchise agreement (i.e., five years) but, (3) that such payments may be amortized over the life expectancy of Samuel W. Jones, Sr., as computed by the mortality tables issued under the Treasury Regulation.

Let the parties agree upon and submit a judgment in accordance with the foregoing conclusions.

7. Hearings, pp. 287, 292.

8. Hearings, p. 418.

9. Hearings, p. 290.

10. Section 1.72–9, Treasury Regulations on Income Tax (1954 Code).