ALEXIS M. HAWKINS AND ROSEMARY K. HAWKINS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hawkins v. Commissioner
Docket No. 4779-78
United States Tax Court
T.C. Memo 1982-451; 1982 Tax Ct. Memo LEXIS 295; 44 T.C.M. (CCH) 715; T.C.M. (RIA) 82451; August 4, 1982. Glen L. Norris and George F. Davison, Jr., for the petitioners. Leonard A. Hammes, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION Korner, Judge:* Respondent determined deficiencies in petitioners' Federal income taxes of $33,488 for 1973 and $16,738 for 1974. After concessions made by the parties, the remaining issues for decision are whether petitioner is entitled to claim: (1) for the year 1973, a share of a partnership loss for the full fiscal year of the partnership, where petitioner was a member of the partnership for less than the full year, (2) an investment tax credit for 1973 on works of fine art, and (3) a $40,000 charitable contribution deduction for a mosaic table top donated in 1974 to a church. *299 FINDINGS OF FACT Some of the facts have been stipulated and are so found. Alexis M. Hawkins ("petitioner") and Rosemary K. Hawkins are husband and wife, who resided in Des Moines, Iowa, at the time they filed their petition in this case. [1] Petitioners filed joint Federal income tax returns for calendar years 1973 and 1974 with the Internal Revenue Service Center at Kansas City, Missouri. I On or about June 8, 1973, seven limited partners of Americana C-G Company, Ltd. (an Iowa limited partnership) transferred their entire aggregate 13/58 interest in the partnership to Alexis M. Hawkins. [2] Petitioner paid $5,000 for each 1/58 share purchased, a total of $65,000 for his interest in the partnership. There was apparently no interim closing of the partnership books to determine the distributive shares *300 of profit and loss of the retiring partners. [3] The partnership books were kept, and its tax returns prepared on the accrual basis and on the basis of a fiscal year ending July 31. Prior to acquiring his interest in the partnership, petitioner notified Americana C-G Company, Ltd. ("the partnership") that *301 his interest in acquiring a share of the partnership was predicated in part upon the partnership making a timely election under section 754 of the Internal Revenue Code[4] which would allow petitioner to adjust his tax basis in the partnership assets. In a letter dated January 1, 1973, the partnership, through its general partner, [5] assured petitioner that a timely election would be made under section 754, for the partnership fiscal year ending July 31, 1973. Sales of partnership interests in Americana C-G Company, Ltd. which took place prior to and during the partnership fiscal year ending July 31, 1973, were handled by the partnership on the basis that the buyer would be allocated his proportionate share of partnership loss or gain for the entire fiscal year of his purchase, and that any profits or losses would be allocated solely to the partners of record at the close of the fiscal year. This practice was not followed *302 pursuant to any provision of the partnership agreement, the amendment to that agreement, nor the certificate of limited partnership submitted at trial. The record indicates, however, that the partners generally acquiesced in the practice. On his tax return for 1973, petitioner claimed an ordinary loss deduction from the partnership in the amount of $47,498. The amount of $47,498 reflects 13/58 of the loss of the partnership for the period of August 1, 1972 through July 31, 1973, after adjustments pursuant to sections 754 and 743 of the Internal Revenue Code. The accuracy of the figure has not been challenged by respondent. Such figure includes the deduction of depreciation for the full fiscal year 1973, as well as other allowable expenses. The statutory notice of deficiency allowed petitioner to deduct 14.79452% of the $47,498 loss, or $7,027. The percentage of the loss allowed by the respondent is the mathematical equivalent of 54/365 of the loss claimed by petitioner.This fraction represents the 54 days of the fiscal year ending July 31, 1973 during which petitioner was a member of the partnership. II During 1973 petitioner purchased photo equipment *303 and various pieces of art work. The petitioner's records reflect the following purchases: Reece Paintings
$ 6,901.00 Paintings
129,879.08 African Art
1,016.00 Photo Equipment
325.00 Total
$138,121.00 (rounded)
On his 1973 tax return, petitioner claimed an investment tax credit on new property with a life of seven or more years with a cost or basis of $150,254. Petitioner's claimed investment credit included the alleged cost or basis of the items of art work and photo equipment mentioned above. It is stipulated by the parties that all of the art and photographic equipment is tangible personal property which was in existence more than three years subsequent to 1973. During tax year 1973, petitioner purchased and paid $6,901 for the following art pieces and frames created by Maynard Reece, upon which petitioner claimed an investment tax credit: a. 1948 Federal Duck Stamp Print b. 1951 Federal Duck Stamp Print c. 1959 Federal Duck Stamp Print d. 1969 Federal Duck Stamp Print e. 1971 Federal Duck Stamp Print f. 1972 Iowa State Duck Stamp Print g. 6 Solid walnut frames h. 6 duck stamps i. One Canvasbacks over ice & *304 snow (oil painting) j. One American Widgeon - late afternoon squall (oil painting) k. Pair of lithographs of bobwhite and mallard l. 2 solid walnut frames m.One Mallard plate of Limoges porcelain n. One solid walnut frame The record herein does not establish that the original use of this property commenced with petitioner's acquisition. Petitioner also claimed an investment tax credit on the following items purchased in Italy in 1973: 1.Madonna Sistina - Mosaic 2. Madonna Ansidei - Mosaic 3. Moasic Table - Romulus & Remus 4. Base for Mosaic Table - Romulus and Remus 5. Golden Cask - Mosaic 6. Modella e lo speccio (also referred to as Girl on Bed) - Cassio Oil 7. Tormento (also referred to as Boy and Girl) - Cassio Oil 8. Lady with Orange - Cassio Oil 9. Lady with Orange - Cassio Mosaic 10. Scenario oil bee eijhe (six.) - Cassio Oil 11. King Louis XIV Bronze Statue 12. Base for King Louis XIV Bronze Statue 13. Il Foro Romano - 1800 Mosaic 14. Colosseo - 1800 Mosaic 15. Piccolla Piazza S. Pietro - Mosaic 16. Temple of Sibielle - Mosaic 17. Face of Christ - Mosaic 18. Face of Christ - Oil 19.Fourteen Stations of *305 the Cross - Cassio Oil 20. Mosaic Table - "Allegoria Pompeiana" The record herein does not establish the pieces as to which the original use commenced with petitioner. The cost of acquisition of these items was $129,552.15. [6] Petitioner purchased all of the art that he acquired from Italy from the Vatican, [7] except for the King Louis XIV bronze statue which was purchased during a trip to Florence, Italy. Petitioner is engaged in the practice of law and is licensed by the State of Iowa. As an ordinary and necessary part of his practice *306 of law, petitioner maintained a professional office in Des Moines, Iowa during tax year 1973.The Reece and Italian pieces purchased by petitioner during 1973 were displayed in his law office, although perhaps not all were displayed all the time. Such items were used in petitioner's business. Petitioner did not offer any evidence at trial relating to the use of the African art or the photographic equipment. Petitioners did not claim on their individual tax returns a depreciation deduction on the works of art that were placed in petitioner's law office. Mosaics constituted a substantial percentage of the art petitioner purchased in Italy in 1973. Mosaics consist of thousands of small tesserae made of enamel, stone, glass, semi-precious stones, ceramic, tile or other materials. Due to the fact that mosaics do not fade or crack, many mosaics have remained in virtually the same condition for centuries. Some of the items purchased by petitioner are mosaics that have survived almost two hundred years in good condition. Pieces of art are subject to wear and tear and must be carefully restored if damaged. Humidity and temperature, among other factors, can contribute to this process *307 of deterioration. In petitioner's offices where his art works were displayed, great efforts were made to control heat, cold and humidity. Petitioner went to considerable lengths to maintain his art works in the best possible condition. Petitioner's mosaics, bronze statue, and paintings were not mass produced and are considered fine art as opposed to mere "decorations." Given good conditions and care, as petitioner provided for his art works, such works can have a life of indeterminate length, especially the mosaics, which are made of very durable materials.The record herein does not establish the useful life for petitioner's art works, in excess of the three years stipulated by the parties, nor any reasonable estimated salvage value. In his statutory notice herein, respondent disallowed petitioner's claim of investment credit for the above acquisitions on the ground that these items were not property of a character subject to depreciation allowable under section 167. III On December 26, 1974, petitioner donated a mosaic table top entitled the Allegoria Pompeiana ("Allegoria") to the Roman Catholic Diocese of Des Moines, Iowa. Petitioner paid $12,500 for the Allegoria when *308 he purchased it in Italy in October of 1973 from the Studio Del Mosaico della Rev. Fabbrica di S. Pietro ("Vatican Studio"). Petitioner claimed that the fair market value of this art object was $40,000 when donated and took a charitable deduction in this amount on his tax return for the year 1974. In the statutory notice of deficiency, respondent determined the fair market value of the mosaic to be $12,500. The Allegoria was a piece of fine art, 80 centimeters in diameter, and was in excellent condition at the time it was donated to the Catholic Church. The Catholic Church is a religious and educational institution, within the meaning of section 170. Prior to the donation of the Allegoria to the Catholic Church, numerous attempts were made by various individuals to value this mosaic.Petitioner contacted the prominent appraisal firm of Sotheby Parke Bernet in New York. Sotheby Parke Bernet responded, but declined to value the Allegoria because there were not adequate records of sales of this type. The valuation of this mosaic was further complicated by the closing of the Vatican Studio.This closing eliminated further offerings of Vatican mosaics to the world art market. Information *309 concerning the value of the Allegoria was gathered by other individuals, but the offer of this evidence by petitioner was rejected at trial upon respondent's hearsay objections. Three witnesses testified at trial as to fair market value of the Allegoria. [7] Respondent's witness Mr. Grant placed the fair market value of the Allegoria at $12,500, based primarily upon its purchase price. Petitioner's witness Mr. Webster testified that in valuing a mosaic of this type, the replacement of such an art object would be the retail and not the auction price.It was Mr. Webster's opinion that a private gallery selling the Allegoria would have sold this art piece in December, 1974, at retail at between $25,000 and $28,000. A representative of the current owner testified that the Catholic Church placed a fair market value on this mosaic (at the time of trial herein) of approximately $34,285. *310 The fair market value of the mosaic here in question as of December 1974 was $26,500. OPINION I The Partnership Loss Issue
The first issue which we will consider involves the application of the so-called retroactive allocation prohibition contained in section 706(c)(2)(A). As indicated in our findings of fact, petitioner acquired a 13/58 interest in Americana C-G Company, Ltd. on June 8, 1973. The partnership was on a fiscal year ending July 31. Despite the fact that petitioner was a member of the partnership for only 54 days of the partnership fiscal year, he was allocated his proportionate share of losses which were generated by the partnership over the entire course of the fiscal year. [8] Thus, petitioner claimed a loss of $47,498 from the partnership on his individual return for 1973. This amount represents 13/58 of the loss incurred by the partnership for the period August 1, 1972 through July 31, 1973 after adjustments made pursuant to sections 754 and 743. [9]
*311 In his statutory notice of deficiency, respondent allowed petitioner to claim only 14.79452% of the $47,498 loss generated by the partnership (i.e., 54/365 X $47,498). Thus, respondent allowed petitioner to claim only that proportion of his share of parthership losses which is the same ratio as the number of days during the partnership's fiscal year that he was a member of the partnership bears to the total number of days in the fiscal year. It is by now relatively clear that the provisions of subchapter K generally, and section 706(c) specifically, in conjunction with the assignment of income doctrine, do not permit a partner to deduct losses which were generated by his partnership prior to his entry to the partnership. Snell v. United States,     F.2d     (8th Cir., June 18, 1982). Petitioner does not quarrel with this general proposition and, in fact, concedes the correctness of our decisions, and the decision of the Second Ciruit, which so hold. Marriott v. Commissioner,73 T.C. 1129 (1980); Moore v. Commissioner,70 T.C. 1024 (1978); *312 Rodman v. Commissioner, 542 F.2d 845 (2d Cir. 1976). Moreover, petitioner has conceded that all deduction items making up petitioner's share of the partnership's overall loss, otherthandepreciation, are properly to be allocated, pro rata, between petitioner and the former partners from whom he purchased his interest, under section 706(c)(2)(A). [10] Since respondent's original determination with respect to this issue is based on his contention that all items of partnership income and loss must be allocated on a pro rata basis between petitioner and the selling partner, petitioner has effectively conceded the correctness of respondent's determination with respect to this issue, except insofar as that determination is based on a reallocation of partnership depreciation deductions. *313 Thus, the only disputed issue left for us to consider is petitioner's contentions relating to the partnership - generated depreciation deduction. In this regard, petitioner proffers a two-part argument wherein he maintains that: 1. Depreciation, as a deductible partnership expense, is an annual event which accrues to the partnership only at the end of the partnership's fiscal year when the item is entered into the partnership books, rather than over the course of the entire partnership fiscal year; and 2. This being the case, the partnership's allocation to him of 13/58 of the entire annual depreciation deduction generated by the partnership over the course of the fiscal year in issue is perfectly in accord with the anti-retroactive allocation provisions of section 706(c)(2)(A); that is, since the depreciation deduction purportedly accrued to the partnership, in its entirety, only after petitioner became a member of the partnership, the allocation in issue was not "retroactive" and therefore proper under section 706(c)(2)(A). For the reasons stated herein, we reject petitioner's contentions. Section 167(a) does not by its terms state that a depreciation deduction is an *314 annual event, as contended by petitioner. The closest wording supporting such an inference is found in respondent's regulations which define the depreciation allowance as that amount which is set aside for the taxable year, in accordance with a reasonably consistent plan, so that the aggregate of these amounts, plus salvage value, will equal the cost basis in the property at the end of the useful life of the depreciable property. (A)-1 Sections 1.167 (a)-1(a) and 1.167(a)-10(b), Income Tax Regs. It does not follow from this, however, that depreciation is incurred, and thus is accruable, solely at the end of the taxpayer's fiscal period. The end and purpose of it all [depreciation accounting] is to approximate and reflect the financial consequences to the taxpayer of the subtle effects of time and use on the value of his capital assets * * *. [Detroit Edison Company v. Commissioner,319 U.S. 98, 101 (1943)]. Depreciation is a fact. It reflects the diminution in the value of *315 assets over time because of age, obsolescence, and wear and tear. It is an on-going process, incurred day by day, week by week, month by month, in addition to casual identifiable events. On a purely theoretical basis, it would be proper for a taxpayer to accrue depreciation on its books on a daily basis, in an amount to be determined under the depreciation method employed by the taxpayer in accordance with the provisions of section 167. As a practical matter, of course, this is not done. Rather, taxpayers will typically accrue allowable depreciation deductions on their books on a monthly, quarterly, semi-annual or annual basis, depending upon the methods employed by them in keeping their books. The time of entry of depreciation deductions on the taxpayer's books, however, is not determinative of when the depreciation is actually incurred and is therefore accruable.Making the book entry on a periodic basis rather than on a daily basis is merely a matter of bookkeeping convenience. We will not hold, as petitioner appears to urge, that depreciation deductions are properly accruable only when the taxpayer's bookkeeper finds it convenient to make the entry on the books. To the contrary, *316 we hold that depreciation is properly accruable and deductible as it is incurred. Petitioner has already acknowledged the propriety of allocating his share of the partnership's deductions (other than depreciation) for 1973 between himself and the former partners from whom he purchased his interest on a pro rata basis, acknowledging that the rule enunciated in Moore v. Commissioner,supra, and Marriott v. Commissioner,supra, is applicable here. See also section 1.706-1(c)(2), Income Tax Regs. We hold that such a pro rata allocation of depreciation deductions for the year 1973 between petitioner and the partners from whom he purchased his interest is equally appropriate and necessary. To allocate 100 percent of the depreciation allowance to petitioner would ignore economic reality, and would not "approximate and reflect the financial consequences to the [retiring partner] of the subtle effects of time and use on the value of [the partnership] capital assets." Detroit Edison Company v. Commissioner,supra. *317 Although any reasonable method of making the required allocation is acceptable (see section 1.706-1 (c)(2)(ii) of the regulations), no better method than that which was used by respondent's allocation method is one specifically sanctioned by the above-cited regulation, where, as here, there is no closing of the partnership books. Finally, we note that petitioner alleges that respondent had audited the partnership returns for prior years and had not challenged the allocation method here in dispute. Even if this were true, it would make no difference here. The mere acquiescence by respondent in the treatment given by a taxpayer to certain items in prior years' returns does not prevent the respondent from attacking such treatment in later years. Union Equity Cooperative Exchange v. Commissioner,481 F.2d 812 (10th Cir. 1973), cert. denied 414 U.S. 1028 (1973), affg. 58 T.C. 397 (1972); Easter v. Commissioner,338 F.2d 968 (4th Cir. 1964), affg. a Memorandum Opinion of this Court. On this issue, therefore, we hold *318 for respondent. II The Investment Tax Credit Issue
The second issue for resolution is whether petitioner can claim a section 38 investment tax credit on fine art displayed in his law office. On his 1973 income tax return, petitioner claimed an investment tax credit on new property with a cost of $150,254 and a life of seven or more years. Respondent's notice of deficiency disallowed the investment tax credit claimed with respect to $138,121 of such property. The amount disallowed by the respondent consisted of that portion of the amount that reflected art purchases made by petitioner during 1973. [11]
Respondent argues that the art purchased by petitioner during 1973 did not qualify as section 38 property because it was not depreciable property as defined by section 167. [12] Petitioner disagrees, and *319 asserts that he has shown that the art in question is subject to wear and tear, has a useful life, and a determinable salvage value; therefore, it is petitioner's conclusion that this art is depreciable property for purposes of the section 38 investment tax credit. Section 38 generally provides that there shall be a credit against the income tax for investments made in certain property, as defined and limited in sections 46 through 50. For the property at issue here to qualify for the section 38 investment tax credit, the property [13] must, inter alia, be *320 * * * property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of three years or more. [Section 48(a)(1)] The regulations further clarify the type of depreciable property that qualifies for the section 38 investment tax credit: Property is not section 38 property unless a deduction for depreciation (or amortization in lieu of depreciation) with respect to such property is allowable to the taxpayer for the taxable year. A deduction for depreciation is allowable if the property is of a character subject to the allowance for depreciation under section 167 and the basis (or cost) of the property is recovered through a method of depreciation * * *. [Section 1.48-1(b)(1), Income Tax Regs.] The applicable statutory provision concerning depreciation, controlling for purposes of the issue before us, in section 167. This provision states *321 in relevant part: (A) GENERAL RULE.-- There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, * * *. The regulations that correspond to this statutory provision discuss the concept of a reasonable depreciation allowance. Section 1.167(a)-1, Income Tax Regs., states: § 1.167(a)-1. Depreciation in general.-- (a) Reasonable allowance.Section 167(a) provides that a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business or of property held by the taxpayer for the production of income shall be allowed as a depreciation deduction. The allowance is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of the estimated useful life of the depreciable property, equal *322 the cost or other basis of the property as provided in section 167(g) and section 1.167(g)-1. An asset shall not be depreciated below a reasonable salvage value under any method of computing depreciation. * * * (b) Useful life. For the purpose of Section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade of business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. *323 Salvage value is not a factor for the purpose of determining useful life. * * * (c) Salvage. (1) Salvage value is the amount (determined at the time of acquisition) which is estimated will be realizable upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business or in the production of his income and is to be retired from service by the taxpayer.Salvage value shall not be changed at any time after the determination made at the time of acquisition merely because of changes in price levels. * * * The time at which an asset is retired from service may vary according to the policy of the taxpayer. If the taxpayer's policy is to dispose of assets which are still in good operating condition, the salvage value may represent a relatively large portion of the original basis of the asset. However, if the taxpayer customarily uses an asset until its inherent useful life has been substantially exhausted, salvage value may represent no more than the junk value. Salvage value must be taken into account in determining the depreciation deduction *324 either by a reduction of the amount subject to depreciation or by a reduction in rate of depreciation, but in no event shall an asset (or an account) be depreciated below a reasonable salvage value. * * * Section 1.167(a)-2, Income Tax Regs. further provides: The depreciation allowance in the case of tangible property applies only to that part of the property which is subject to wear and tear, to decay or decline from natural causes, to exhaustion, and to obsolescence * * *. Finally, section 167(g) provides: (g) Basis for depreciation. - The basis on which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 1011 for the purpose of determining the gain on the sale or other disposition of such property. The above-quoted sections of the Code and the regulations therefore establish that in order *325 for a deduction for depreciation to be "allowable", the following essential facts must be established: (a) The depreciable basis of the property, section 167(g). (b) The useful life of the property, whether measured by the inherent useful life of the property itself, or by its useful life in the taxpayer's trade or business. Potts, Davis & Company v. Commissioner,431 F.2d 1222, 1224 (9th Cir. 1970), affg. a Memorandum Opinion of this Court; John R. Thompson Company v. United States,477 F.2d 164, 169 (7th Cir. 1973), affg. 338 F. Supp. 770 (N.D. Ill. 1971); Judge v. Commissioner,T.C. Memo. 1976-283; section 1.167(a)-1(b), Income Tax Regs.
(c) A reasonable estimate of salvage value, which must be less than the depreciable basis of the property, since only the difference between the depreciable basis and the salvage value is "allowable" as a depreciation deduction, section 1.167(a)-1(c), Income Tax Regs.
All the above elements must be established in order to show that a deduction for depreciation is allowable. In this case, the burden of proof to *326 establish these facts is upon the petitioner, Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Although we have found (albeit with some difficulty) that petitioner has met his burden of proof with respect to establishing his depreciable cost basis for the items involved herein (at least on a group basis), and we have made appropriate findings to that effect, we must hold that petitioner has failed to meet his necessary burden of proof with respect to items (b) and (c). With respect to establishing the "useful life" of the art works in issue, respondent apparently takes the position that works of fine art are simply not depreciable, because no determinable useful life can be found. Rev. Rul. 68-232, 1968-1 C.B. 79. Whether this revenue ruling purports to lay down a flat rule, as respondent claims, that fine art is not depreciable property under any circumstances is a question we need not address. [14] Even if theoretically depreciable, it is incumbent upon petitioner to show the depreciable or useful life of the property. Petitioner herein has made no serious attempt to demonstrate the inherent useful *327 life of the property, as opposed to its useful life in the petitioner's trade or business, and the evidence of record strongly indicates that this would be an impossible task. Instead, petitioner has argued that, under the specific provisions of section 1.167(a)-1(b) of the Income Tax Regs., quoted above, and the doctrine enunciated by the Supreme Court in Massey Motors Inc, v. United States,364 U.S. 92 (1960), and Hertz Corporation v. United States,364 U.S. 122 (1960), petitioner can establish a useful life for the art works, on the grounds that such art works are used in his trade or business of practicing law; that such art works are, therefore, useful to his trade or business only for as long as he practices law; and that such period should be determined *328 by reference to the standard mortality tables giving petitioner's life expectancy. Assuming, arguendo, that petitioner's reliance on the above-cited case law is not misplaced, petitioner's proof herein is still deficient in two essential respects: (1) There is no evidence in the record, including petitioner's testimony, that petitioner intends to continue in the practice of law until he dies; and, even if we were to assume this to be the case, (2) There is no proof in this record as to petitioner's age which would permit us to use any accepted mortality tables in determining the useful life of the art objects based upon petitioner's life expectancy. [15]
We therefore hold that petitioner has failed to meet his necessary burden of proof to establish a useful depreciable life for the art works in question. Petitioner's failure of proof on this point has a direct impact on the third prong of petitioner's necessary proof -- that a salvage value for the depreciable property be established for the property at the end of its useful life which is less than its original cost, *329 the difference being the amount which would be allowable as depreciation. Since the allowable depreciation, plus salvage value, can in no event exceed the cost or other basis of the property under the above-quoted regulations, there is a direct linkage between the two elements.
Salvage value must be determined at the time of acquisition with reference to a specific point in time, viz., the end of the property's useful life, section 1.167(a)-1(c), Income Tax Regs. In this record, there is a complete failure to establish a salvage value for the art works in any amount or at any point in time. [16]
As we have noted above, there is no proof in this record as to the inherent life of these art works, which would establish a point at which salvage value could be reasonably estimated. As we have further pointed out, we are unable to determine a time when salvage value is to be determined, *330 based upon the ending of the useful life of the property in petitioner's trade or business. Testifying generally, and without any reference to a particular time, both petitioner's expert witness Webster and respondent's expert witness Young testified that it would be impossible to place a salvage value on these works of art on anything but the most speculative basis. Neither witness would commit to an overall specific figure for reasonably estimated salvage value (either as a whole or on an individual basis) and significantly, petitioner has not even requested us to find a salvage value, contending only that he was able to establish that some salvage value exists. [17] While it may be conceded that in the context of the present issue, involving petitioner's right to an investment tax credit under the provisions of section 38, it may not be necessary for petitioner to prove a specific dollar figure for salvage value (as would indeed be the case if the issue were the dollar amount of the allowable depreciation deductions themselves under section 167), it is nevertheless necessary for petitioner to prove that there was a salvage value which was measurably less than the depreciable cost *331 basis for the property, in order to establish that any depreciation deductions would be "allowable", as required by section 48(a)(1). We therefore hold that, petitioner having failed to carry his necessary burden of proof to show that any depreciation was allowable with respect to these art objects, respondent's determination that no section 38 credit is to be allowed on account of their acquisition must be sustained. Compare Judge v. Commissioner,supra.
III The Charitable Donation Issue
The final issue for resolution is the value of the Mosaic Table, "Allegoria Pompeiana" for purposes of determining the amount of the charitable contribution (of the table top alone) made by the taxpayer to the Roman Catholic Diocese of Des Moines ("Church") in tax year 1974. Petitioner claims that at the time of the gift, the Allegoria had a fair market value of $40,000. Respondent, on the other hand, asserts that the best possible indication of the fair market value of Allegoria is the $12,500 that petitioner paid *332 for the mosaic table some 14 months earlier. We approach this task with great hesitation, for the circumstances in this case are unique. The Allegoria was purchased from the Vatican Studio in October of 1973. After petitioner's purchase of this and other art pieces, the Vatican Studio closed. Prior to the time that the petitioner donated the Allegoria to the Church, the petitioner instituted an investigation to value the Allegoria for purposes of determining the amount of the charitable deduction that he should claim. In the course of this investigation, he contacted Sotheby Parke Bernet, a well-known auction firm in New York. This firm refused to place a value on the Allegoria because there were no adequate records of sales of comparable art pieces in the United States, nor anywhere else as far as could be determined. The Allegoria is in excellent condition and is a unique, rather than mass-produced, piece of art. There appears to be some confusion as to the age of the Allegoria. However, it is in evidence that it is an old piece of art that was created sometime during the early part of the 19th century. The valuation of the Allegoria is a question of fact that this *333 Court must decide. McGuire v. Commissioner,44 T.C. 801, 812 (1965). Valuation has consistently been recognized as an inherently imprecise process. Estate of David Smith v. Commissioner,57 T.C. 650, 655 (1972), affd. 510 F.2d 479 (2nd Cir. 1975); Morris M. Messing v. Commissioner,48 T.C. 502, 512 (1967). It is our present task to determine the fair market value of the Allegoria as of December 26, 1974.
Fair market value is defined in the regulations as: * * * the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts * * *. [Section 1.170A-1(c)(2), Income Tax Regs.] In the present case, the evidence of fair market value presented at trial consists almost wholly of opinion testimony of the parties' respective witnesses. Three witnesses testified at trial as to the fair market value of the Allegoria. Petitioner's witnesses consisted of an *334 eminently qualified art expert, Mr. Donald Webster, and Roger Cloutier, a representative of the current owner of the mosaic. Respondent's witness, Mr. Wiley C. Grant, was an appraiser employed by the Internal Revenue Service.
Mr. Cloutier testified that he was a member of the Finance Committee of the Roman Catholic Diocese of Des Moines, and undertook, as a part of his duties, to determine the value of the Allegoria. This witness testified that the diocese did not have a museum or display area, and his attempt to value this art object resulted from the known intention of the Church to eventually sell this mosaic. Mr. Cloutier's investigation was initiated to better advise the Church of when to dispose of the art object and for what price. Mr. Cloutier did not testify as an expert witness. After evaluating the information that he had received as a result of his inquiries and independent research, Mr. Cloutier could not establish a specific value for the Allegoria. However, it was apparent to him that the Allegoria was not an art object of a type easily to be found. Mr. Cloutier, therefore, valued this mosaic at approximately $34,285 (as of the time of trial herein in 1980). *335 Although Mr. Cloutier is not an expert, his testimony, as the representative of the owner, is permissible. Rule 701, Federal Rules of Evidence.
Petitioner's second witness was Donald Webster, a nonpracticing attorney who had devoted himself exclusively to the art and antique business for the last 12 to 15 years. Mr. Webster was the co-owner of C. G. Sloan & Company, an old established firm that specializes in the auctioneering of fine arts and antiques. He was also the president of Webster Fine Art, Inc., a firm that buys and sells fine arts. It was apparent that Mr. Webster had done a great deal of appraising over the years in the course of his business. His qualifications as an expert were impressive. Besides thirty years of experience in the business, he had also advised the Internal Revenue Service on numerous occasions concerning art valuation. It was the opinion of Mr. Webster that the Allegoria was a work of fine art. He differed, however, with the $40,000 fair market value placed upon the Allegoria by petitioner. He testified that in late 1974, a high-class gallery would have been able to sell an art piece of comparable quality to the Allegoria for approximately *336 $25,000 to $28,000. He also testified that atauction this piece of fine art would have probably sold for $14,000 to $15,000. It was Mr. Webster's conclusion that the retail and not the auction price should be used when determining the replacement value for this art object. Respondent's only witness on this issue was Mr. Grant. Mr. Grant's educational background in the field of art is limited to a B.A. degree in English literature, and a minor in art history. From 1975 until the time of trial, Mr. Grant has been employed as an appraiser of art work for the Internal Revenue Service.
Mr. Grant placed a fair market value on the Allegoria of $12,500 for purposes of the charitable deduction taken by petitioner in 1974. When he was asked to make his appraisal, Mr. Grant testified that he was furnished with four large photographs of the Allegoria, the purchase date, the acquisition cost, and the name of the seller. [18] No other information bearing on the value of this art work was furnished to this witness. *337 The appraised value of the Allegoria, as determined by Mr. Grant, was based in part upon the catalogue price for what he considered to be comparable mosaics selling on or about the time that petitioner made his gift to the Church. Mr. Grant stated that he looked to the major auction catalogues for purposes of determining the selling price of similar mosaics. He also stated that petitioner's purchase price of the Allegoria some 15 months prior was the best indication of its current value. Respondent's witness, however, admitted at trial that he did not consult experts on mosaics when he made his appraisal, but relied almost entirely upon the comparison of the Allegoria to two mosaics found in two separate art catalogues. Both mosaics, judged by Mr. Grant to be comparable to the Allegoria, were illustrated by black and white photographs of 2 inches by 3 inches. The testimony of all three witnesses was not well supplemented at trial by documentary evidence. The two "experts" who testified at trial based their valuation of this art piece solely on photographs. [19] In determining the fair market value of any given piece of art, the sales price of comparable art is an important *338 factor. Estate of David Smith v. Commissioner,57 T.C. 650, 659 (1972). Unfortunately, none of the witnesses were able to produce sales prices of truly comparable pieces. In the present case, we do not find that two 2" X 3" black and white photographs studied by respondent's expert witness is of sufficient probative value as to be determinative of the fair market value of the Allegoria. Further, the photographs and the accompanying material found in these catalogues were not offered into evidence by the respondent. On the other hand, Mr. Webster testified that he had sold similar mosaics and, in comparison to those, his estimation of the retail (as compared to wholesale) value of the Allegoria was approximately 25 to 28 thousand dollars. Finally, the testimony of Mr. Cloutier is marginally persuasive in that it buttresses our conclusion that the Allegroia had a fair market value in 1974 substantially in excess of the $12,500 figure placed upon it by respondent. We decline to comment further on *339 the sketchy evidence submitted on this issue, [20] except to note that Vatican mosaics are no longer available on the world market. This makes it more difficult to find comparables for valuation purposes, but probably also increased the value of existing pieces. Petitioner's witness Mr. Webster was the only witness with the wealth of experience necessary to offer concrete opinion evidence on this issue. Accordingly, after considering all the facts presented -- and not presented -- in this record, we have found that a willing buyer and willing seller, acting solely on the basis of the information submitted in this Court in this case, would have arrived at a sale price for the Allegoria of $26,500. Petitioner's charitable deduction should be limited to that amount. To give effect to the above, as well as concessions by the parties on other issues, Decision will be entered under Rule 155.
Footnotes
*. This case was tried before Judge Cynthia Holcomb Hall↩ who subsequently resigned from the Court. By order of the Chief Judge, the case was reassigned to Judge Jules G. III.
1. Petitioner Rosemary K. Hawkins is involved herein only because she filed a joint return with her husband, Alexis M. Hawkins for the years in issue, and will not be referred to further herein.↩
2. The exact date of this transfer is not evident from the record.In his notice of deficiency, respondent calculated petitioner's partnership loss on the assumption that the transfer of the 13/58 interest in the partnership took place on June 8, 1973 and petitioner requested the Court to fine the same date. We accept it. ↩
3. The fact that the accountants for Americana prepared the partnership tax return for its fiscal year 1973, and allocated all operating losses attributable to the 13/58 interest in the partnership to petitioner, indicates that there was no interim closing of the partnership books. The partnership books were not entered into evidence, and petitioner did not allege that there was such a closing. No special allocations of income, gain or loss were made to partners in the partnership returns for 1973, nor in the partnership's audited financial statement.↩
4. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue. ↩
5. Investors Service Corporation was the sole general partner in the partnership known as Americana C-G Company, Ltd.↩
6. In arriving at the cost basis of the above items, we have done the best we could with an unsatisfactory record, giving consideration to all the evidence, but relying principally upon the itemization of petitioner's expenditures as contained in the parties' supplemental stipulation of facts, and screening out what appear to be expenditures of a personal nature, e.g., costs of hotels, air travel, etc. Mr. McLaughlin testified on the issue of the deed of gift executed by petitioner when he donated the Allegoria to the Catholic Church. Testimony by this witness indicated the type of inquiries he made before the execution of this deed. These inquiries included contacting Rome in order to set a value on the Allegoria. The exhibit offered in connection with this witness's testimony was not accepted into evidence upon respondent's hearsay objection. Therefore, his testimony on the value of the Allegoria will not be considered.
[7]↩ Art was purchased from the Vatican Mosaic School, individuals in the Vatican who owned particular pieces of art, and a store in close proximity to the Vatican. Apparently, all three were affiliated with the Vatican in some manner.
8. This allocation was made pursuant to a general understanding that partnership profits and losses would be allocated solely to partners of record at the close of the taxable year. We note that whether or not this understanding represented a part of the partnership agreement is not significant to our ultimate resolution of this issue. Even if it did, the allocation requirements of section 706(c)(2) take precedence over the authority given to partnership allocation agreements by sections 704(a) and 761(c). Marriott v. Commissioner,73 T.C. 1129 (1980); Moore v. Commissioner,70 T.C. 1024↩ (1978). 9. There appears to be some confusion as to what partnership losses are reflected in the $47,498 taken by petitioner on his 1973 tax return. The parties have stipulated that this amount reflects 13/58 of the loss incurred by Americana for the period of August 1, 1972, through July 31, 1973, after adjustments made pursuant to section 754 and 743 of the Internal Revenue Code↩. Except for the partnership depreciation deduction, petitioner now states (on brief) that all losses allocated to the petitioner by the partnership in fiscal year 1973 were calculated on the basis of the number of days during the tax year that he was a member of the partnership. This latter statement is inconsistent with the above stipulation, exhibits and testimonial evidence. We have found that the $47,498 figure represents the full 13/58 of the loss incurred by Americana during fiscal year 1973, including all items.
10. Section 706(c)(2)(A) provides in pertinent part as follows: (2) Partner Who Retires or Sells Interest in Partnership. - (A) Disposition of entire interest. - The taxable year of a partnership shall close -- (i) With respect to a partner who sells or exchanges his entire interest in a partnership, * * *. Such partner's distributive share of items described in section 702(a) for such year shall be determined, under regulations prescribed by the Secretary, for the period ending with such sale, exchange, or liquidation.↩
11. The record indicates that respondent disallowed an investment tax credit on the following: Reece Paintings, Mosaics, African art, photographic equipment, and a statue purchased by petitioner in Italy in 1973. Petitioner has apparently abandoned the issue relating to the African art and photographic equipment, and they will not be referred to further herein.↩
12. Both parties at trial agreed that the issue concerning petitioner's art is a relatively narrow one, requiring the Court merely to decide whether the art used in petitioner's law office is depreciable property. In view of our holding herein, we do not have to concern ourselves with another potential problem which the parties never addressed and on which the record is inadequate, viz., whether the art works in petitioner's hands constituted "new" or "used" section 38↩ property within the meaning of sections 48(b) and (c).
13. Which is tangible personal property, as the parties have stipulated, see section 48(a)(1)(A).↩
14. Note that some unease was expressed on this point by the District Court in John R. Thompson Co. v. United States,338 F. Supp. 770, 778, 779 (E.D. Ill. 1971), and this portion of its opinion was specifically approved by the Seventh Circuit in affirming under the facts of that case, 477 F.2d 164, 169↩ (7th Cir. 1973).
15. Compare Hampton Pontiac, Inc. v. United States,294 F. Supp. 1073↩ (D.S.C. 1969).
16. In the context of this case, "salvage value" is to be read as the reasonably estimated resale value of the property at the time its useful depreciable life terminates.↩
17. This difficulty may, or may not, account for the failure of petitioner to claim any depreciation deductions with respect to the property.↩
18. Petitioner attempted to introduce an appraisal of $40,000 by the individual who sold the Allegoria to petitioner. This appraisal was not allowed to be introduced into evidence upon respondent's hearsay objection.↩
19. Respondent's witness had, prior to trial, but after his appraisal of the Allegoria, seen this art object. Petitioner's witness had never seen this mosaic.↩
20. We imply no criticism of the parties on this point. Valuing a unique piece like the Allegoria is clearly a most difficult task, and the degree of proof which we require must be tempered by the practicalities of the situation to some extent.↩